# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>SALVADOR VERA, aka "Magic," aka "Sas,"<br>ARMANDO VERA, aka "Mando,"<br>JAVIER CAMACHO, aka "Primo,"<br>JULIO AHUMADA,<br>JOSE GOICOCHEA, aka "Shorty,"<br>RUBEN GUERRERO OREJEL, aka "Crow,"<br>EDGAR MONDRAGON, aka "Little Clown,"<br>ALEJANDRO BARRAGAN, aka "Gato,"<br>JESUS HIGAREDA, aka "Yogi,"<br>GLORIA CALDERON,<br>ELMER DUARTE, aka "MeMe," aka "Bugsy,"<br>SARAH STEWART, aka "Sarah Hammond,"<br>FILIPP CHEBOTAREV,<br>LETICIA ISABEL SANCHEZ,<br>SYLVIA MONDRAGON, | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>08-<br><br>SA MJ 08-580<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>OCT 14 2008<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |

Complaint for violation of Title 21, United States Code, §§ 841(a)(1), 846.

| NAME OF MAGISTRATE JUDGE<br>ROBERT N. BLOCK | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Orange County |
|---|---|---|

| DATE OF OFFENSE<br>unknown, but at least as early as April 2007, to October 14, 2008 | PLACE OF OFFENSE<br>Orange County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

See Attached Complainant's Statement.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>OFFICIAL TITLE<br>Steven Lodge, Santa Ana Gang Task Force<br>Santa Ana Police Department |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>**ROBERT N. BLOCK** | DATE<br>October 14, 2008 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA: TKF:tkf

TABLE OF CONTENTS

|  |  |  | PAGE |
|---|---|---|---|
| I. | | TRAINING AND EXPERIENCE | 1 |
| II. | | THE OFFENSES | 3 |
| III. | | TARGETS OF THE INVESTIGATION | 3 |
| | a. | SALVADOR REYES VERA | 3 |
| | b. | ARMANDO VERA | 4 |
| | c. | JAVIER FERNANDO CAMACHO | 4 |
| | d. | JULIO AHUMADA | 5 |
| | e. | JOSE GOICOCHEA | 5 |
| | f. | RUBEN GUERRERO OREJEL | 5 |
| | g. | EDGAR MONDRAGON | 6 |
| | h. | ALEJANDRO BARRAGAN | 6 |
| | i. | JESUS HIGAREDA | 6 |
| | j. | GLORIA CALDERON | 6 |
| | k. | ELMER DUARTE | 6 |
| | l. | SARAH CATE STEWART | 6 |
| | m. | FILIPP CHEBOTAREV | 7 |
| | n. | LETICIA ISABEL SANCHEZ | 7 |
| | o. | SILVIA MONDRAGON | 7 |
| IV. | | SEARCH WARRANT LOCATIONS | 7 |
| V. | | COMPUTER DATA | 9 |
| VI. | | ITEMS TO BE SEIZED | 11 |
| VII. | | IDENTIFICATION AND EXPERTISE | 19 |

i

TABLE OF CONTENTS (CONTINUED)

PAGE

VIII. <u>TITLE III INTERCEPTIONS OF CERTAIN TELEPHONE NUMBERS</u> . 25

IX.   <u>PROBABLE CAUSE</u> . . . . . . . . . . . . . . . . . . . 27

   A.   <u>Summary of Investigation/Overview of the Minnie</u>
        <u>Street Lopers Gang</u> . . . . . . . . . . . . . . . . 27

   B.   <u>Confidential Informants</u> . . . . . . . . . . . . . 30

        <u>Confidential Informant #1 ("CI #1")</u> . . . . . . . . 30

        <u>Confidential Informant #2 ("CI #2")</u> . . . . . . . . 32

   C.   <u>Summary of the Conspiracy</u> . . . . . . . . . . . . 35

   D.   <u>A. VERA Sells Heroin to CI #1</u> . . . . . . . . . . 36

   E.   <u>BARRAGAN Sells Cocaine Base to CI #1</u> . . . . . . . 37

   F.   <u>CAMACHO and SANCHEZ Sell Cocaine Base to</u>
        <u>CI #2</u> . . . . . . . . . . . . . . . . . . . . . 38

   G.   <u>J. HIGAREDA and OREJEL Sell Methamphetamine to</u>
        <u>CI #2</u> . . . . . . . . . . . . . . . . . . . . . 43

   H.   <u>VERA and A. VERA Obtain Cocaine Base From</u>
        <u>CAMACHO</u> . . . . . . . . . . . . . . . . . . . . 45

   I.   <u>VERA Directs GOICOCHEA to the</u>
        <u>Methamphetamine Supplier</u> . . . . . . . . . . . . 46

   J.   <u>VERA Delivers Narcotics to STEWART</u> . . . . . . . . 47

   K.   <u>VERA Directs a UM to Contact A. VERA to</u>
        <u>Obtain Cocaine</u> . . . . . . . . . . . . . . . . . 49

   L.   <u>AHUMADA Delivers Narcotics to STEWART at VERA's</u>
        <u>Direction</u> . . . . . . . . . . . . . . . . . . . 50

   M.   <u>GOICOCHEA Sells Methamphetamine to CI #2</u> . . . . . 51

   N.   <u>OREJEL Sells Methamphetamine to CI #1</u> . . . . . . 52

TABLE OF CONTENTS (CONTINUED)

PAGE

O.    GOICOCHEA Sells Methamphetamine to CI #2 . . . . . .    52

P.    A. VERA Discusses Cocaine Base . . . . . . . . . . .    54

Q.    A. VERA and DUARTE Distribute Cocaine . . . . . . .    55

R.    A. VERA Directs the Distribution of Heroin . . . .    57

S.    CHEBOTAREV Obtains Heroin From A. VERA . . . . . .    57

T.    STEWART Buys Additional Narcotics to Distribute
      From A. VERA . . . . . . . . . . . . . . . . . . . .    59

U.    A. VERA and DUARTE Conspire to Distribute
      Cocaine Base . . . . . . . . . . . . . . . . . . . .    62

V.    A. VERA Orders Cocaine Base From CAMACHO . . . . .    63

W.    MONDRAGON Sells Heroin to CI #2 . . . . . . . . . .    63

X.    OREJEL and MONDRAGON Sell Heroin to CI #1 . . . . .    64

Y.    OREJEL, MONDRAGON, and S. MONDRAGON Sell Heroin
      to CI#2 . . . . . . . . . . . . . . . . . . . . . .    65

Z.    A. VERA and CAMACHO Sell Cocaine Base to CALDERON .    66

AA.   GOICOCHEA Sells CI #2 Methamphetamine . . . . . . .    69

BB.   A. VERA and DUARTE Conspire to Distribute Heroin .    70

CC.   CHEBOTAREV Obtains Additional Heroin From A. VERA .    71

DD.   STEWART Obtains Additional Narcotics To Distribute
      From A. VERA . . . . . . . . . . . . . . . . . . . .    71

EE.   Calls Evidencing Higher-Ranking Gangs Want to
      Tax VERA for His Drug Trafficking Activities . . .    76

X.    ADDITIONAL PROBABLE CAUSE FOR THE CONSPIRACY . . . . . .    80

      ALEJANDRO BARRAGAN . . . . . . . . . . . . . . . . . .    80

TABLE OF CONTENTS (CONTINUED)

PAGE

JESUS HIGAREDA . . . . . . . . . . . . . . . . . . . . . 81

LETICIA SANCHEZ . . . . . . . . . . . . . . . . . . . . 82

RUBEN GUERRERO OREJEL AND THE MONDRAGONS . . . . . . . . 85

XI.  ADDITIONAL PROBABLE CAUSE TO SEARCH THE
     SUBJECT PREMISES . . . . . . . . . . . . . . . . . 87

SUBJECT PREMISES ONE . . . . . . . . . . . . . . . . . 87

SUBJECT PREMISES TWO . . . . . . . . . . . . . . . . . 93

SUBJECT PREMISES THREE . . . . . . . . . . . . . . . . 96

SUBJECT PREMISES FOUR . . . . . . . . . . . . . . . . . 96

XII. CONCLUSION . . . . . . . . . . . . . . . . . . . . 97

ATTACHMENT A-1

ATTACHMENT A-2

ATTACHMENT A-3

ATTACHMENT A-4

ATTACHMENT B

<u>A F F I D A V I T</u>

I, STEVEN LODGE, being duly sworn, hereby declare and say:

## I.    <u>TRAINING AND EXPERIENCE</u>

1.    I am a Detective with the Santa Ana Police Department ("SAPD"), and have been employed with SAPD for the past 27 years. As a police officer with the SAPD, I have received 640 hours of academy training and additionally over 500 hours of formal and informal training which included training in the area of narcotics and criminal street gangs including, but not limited to the recognition, objective symptoms, sales and packaging for sales of Illegal narcotics.  I have attended the past four California Narcotics Officers Association annual conferences and attended many of their seminars over the past several years.  I also attended numerous National Criminal Street Gang Association conferences over the past ten years.  I have been sworn in as a Special Deputy United States Marshal and have the authority to investigate violations of Titles 18 and 21 of the United States Code.

2.    As a police officer with the SAPD, I have personally made over 2,000 narcotic and gang related arrests, and have assisted on hundreds more.  I have conducted over a thousand hours of surveillances in high narcotic and gang areas.  I have witnessed hand to hand transactions between drug dealers and users.  I have observed gang members interacting when they have been unaware of police presence.  I have monitored telephone

intercepts and listened to gang members and narcotic dealers communicating without police knowledge.

3.    I have been testifying on a regular basis for the past 25 years as a narcotic and gang expert and have testified in both State and Federal Courts.  I have worked as a Detective for the SAPD Suppression team and the SAPD Gang Homicide detail and have conducted numerous complex investigations and have written numerous search warrants related to those investigations.  I have participated in most aspects of criminal street gang and narcotics investigations, including, but not limited to, wire communication intercepts, physical surveillance, utilization of confidential informants, consensually monitored telephone conversations, the writing and service of search warrants and the arrest of gang members.  I have also consulted with narcotic and gang experts in relations to methods and practices of criminal street gang members participating in murder, attempted murder, conspiracy to commit murder, extortion, assault with a deadly weapon, and narcotics trafficking.

4.    In addition, through my investigations, my training and experience, and my discussions with other law enforcement personnel, I have become familiar with the tactics and methods used by illegal drug traffickers to smuggle and safeguard illegal drugs, to distribute illegal drugs, to collect and launder the money from the sale of illegal drugs and the clandestine

manufacturing of narcotics. The tactics and methods I am familiar with include using cellular telephones, using cloned communication devices, using digital display paging devices, using debit calling cards, using pay telephones, using counter-surveillance techniques, using false or factitious identities, and using coded communications and coded words in conversations.

5. I am currently assigned to the SAPD Career Criminal Unit in the Special Investigations Division. I am currently a member of the Santa Ana Gang Task Force ("SAGTF"), which consists of the Federal Bureau of Investigations ("FBI"), the SAPD, and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I am currently the most senior Detective with the SAPD.

## II. THE OFFENSES

6. This affidavit is in support of a complaint, arrest warrants and search warrants charging the following subjects (hereinafter referred to as the "Targets") with an on-going conspiracy to distribute controlled substances and possession of controlled substances with the intent to distribute, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## III. TARGETS OF THE INVESTIGATION

7. The following persons are named as Targets of this investigation:

a. **SALVADOR REYES VERA**, also known as ("aka") "Magic," aka "Sas," ("VERA"), Date of Birth ("DOB") December 4,

3

1980, California Drivers License ("CDL") D1886871. VERA has felony convictions for receiving stolen property, grand theft, possession of a controlled substance for sale. He also has a misdemeanor conviction for spousal battery. VERA has a current firearm restriction because he is a convicted felon. VERA is a documented Minnie Street Lopers gang member. It is believed that VERA is one of the leaders of the Minnie Street Lopers criminal street gang and that he oversees all of the narcotics trafficking in the Minnie Street Lopers gang territory within Bishop Manor. VERA resides at **SUBJECT PREMISES TWO** with his brother Armando VERA, and is believed to store narcotics and narcotics proceeds at **SUBJECT PREMISES ONE**.

b.    **ARMANDO VERA**, aka "Mando," ("A. VERA"), DOB June 24, 1982, CDL D2695508. A. VERA has no criminal history. A. VERA is a documented Minnie Street Lopers gang member. A. VERA is believed to be the brother of VERA and is second-in-command of the Minnie Street Lopers criminal street gang. He assists VERA with his narcotics trafficking activities in the Minnie Street Lopers gang territory within Bishop Manor. A. VERA resides at **SUBJECT PREMISES TWO** with his brother VERA, and is believed to store narcotics and narcotics proceeds at **SUBJECT PREMISES ONE**.

c.    **JAVIER FERNANDO CAMACHO**, aka "Primo," ("CAMACHO"), DOB February 17, 1962. CAMACHO is a Hispanic male who is believed to reside at 1206 N. Parton #210, Santa Ana, California.

4

He has prior convictions from 2003 for possession of a controlled substance for sale and possession/purchase of cocaine base for sale. CAMACHO is a cocaine base supplier to VERA and others in the Bishop Manor area. He was arrested by SAPD on October 7, 2008 for possession of cocaine at 1600 N. Parton, Santa Ana, California and is currently incarcerated in state custody.

d. **JULIO AHUMADA** ("AHUMADA"), DOB March 26, 1986, CDL D6641139. AHUMADA is a Hispanic male who is believed to reside at 1916 Orange, Santa Ana, California. AHUMADA has no known criminal history, but is believed to be a runner for VERA and his associates. Specifically, he is known to deliver narcotics to one of VERA's regular customers.

e. **JOSE GOICOCHEA**, aka "Shorty," ("GOICOCHEA"), DOB January 6, 1983; CDL D1886638. GOICOCHEA is a Hispanic male. He has a felony conviction from 2005 for possession of a controlled substance. GOICOCHEA is a high ranking member of the Minnie Street Lopers and can sell illegal drugs freely in the Bishop Manor. GOICOCHEA resides at **SUBJECT PREMISES FOUR**.

f. **RUBEN GUERRERO OREJEL**, aka "Crow," ("OREJEL"), DOB February 8, 1980, CDL X4285761. OREJEL is a high ranking member of the Minnie Street Lopers and can sell illegal drugs freely in the Bishop Manor. OREJEL resides at **SUBJECT PREMISES THREE** with his wife, S. MONDRAGON, and her brother MONDRAGON. OREJEL works during the day and utilizes MONDRAGON as his runner during the

5

day.

g.  **EDGAR MONDRAGON**, aka "Little Clown," ("MONDRAGON"), DOB September 14, 1989.  MONDRAGON has an arrest and release from 2007 for possession of 28.5 grams of marijuana. MONDRAGON is the brother-in-law of OREJEL and a runner for OREJEL.  MONDRAGON also lives at **SUBJECT PREMISES THREE**.

h.  **ALEJANDRO BARRAGAN**, aka "Gato," ("BARRAGAN"), DOB July 16, 1968.  BARRAGAN is a Mexican citizen with no legal status to be in the country and does not have a California driver's license.  He has an arrest from 2008 for possession of marijuana for sale.  It is believed that BARRAGAN is a protected narcotics dealer in the Minnie Street Lopers territory who is allowed to sell narcotics in the Minnie Street Lopers territory.

i.  **JESUS HIGAREDA**, aka "Yogi," ("J. HIGAREDA"), DOB June 5, 1984.  It is believed that J. HIGAREDA is a protected narcotics dealer in the Minnie Street Lopers territory who is allowed to sell narcotics in the Minnie Street Lopers territory.

j.  **GLORIA CALDERON** ("CALDERON"), DOB October 21, 1982, CDL D2138547.  She has no criminal history.  I have learned from the investigation that Calderon is a "crack" cocaine dealer.

k.  **ELMER DUARTE**, aka "Meme," aka "Bugsy," ("DUARTE"), DOB March 29, 1990.  DUARTE is believed to be one of the main individuals who sells narcotics on behalf of VERA.

l.  **SARAH CATE STEWART**, a.k.a. Sarah Hammond,

6

("STEWART"), DOB May 10, 1961 and CDL N8281174.  STEWART is a Caucasian female who is believed to reside at 112 Nantucket Lane, Aliso Viejo, California 92656.  Based on the telephone calls intercepted over the Target Telephones, and surveillance conducted during this investigation, I have learned that STEWART purchases narcotics from VERA for resale to other individuals.

      m.    **FILIPP CHEBOTAREV** ("CHEBOTAREV"), DOB July 19, 1985, CDL D4284483.  He has no criminal history.  I have learned from the investigation that CHEBOTAREV purchases heroin from VERA for resale to other individuals.

      n.    **LETICIA ISABEL SANCHEZ**, ("SANCHEZ"), DOB August 7, 1980, CDL D1712251.  SANCHEZ is a Hispanic female who resides in the Bishop Manor Complex at 1000 E. Bishop Street, Apartment #H1, Santa Ana, California.  She is believed to be a close associate of VERA and also a broker of narcotics transactions.

      o.    **SILVIA MONDRAGON** ("S. MONDRAGON"), DOB January 10, 1980, CDL D8677662.  She has no criminal history.  I have learned from the investigation that MONDRAGON is the wife of OREJEL and assists with his illegal drug business in distributing the narcotics and other activities.  S. MONDRAGON resides at **SUBJECT PREMISES THREE** with OREJEL and her brother MONDRAGON.

**IV.   SEARCH WARRANT LOCATIONS**

    8.    This affidavit is also in support of a request for the issuance of search warrants to search the following locations:

7

a.   The stash pad and residence of VERA and A. VERA's sister, located at 929 E. Camile Street, Santa Ana, California, including any storage lockers, cabinets, sheds, closets or outbuildings at this location (**SUBJECT PREMISES ONE**) and as further described in Attachment A-1, incorporated herein by reference.

b.   The primary residence of VERA and A. VERA located at 1001 E. Camile Street, Unit A1, Santa Ana, California, including any storage lockers, cabinets, sheds, closets or outbuildings at this location (**SUBJECT PREMISES TWO**) and as further described in Attachment A-2, incorporated herein by reference.

c.   The primary residence of OREJEL, MONDRAGON, and S. MONDRAGON located at 1000 E. Bishop Street, Apt. U2, Santa Ana, California, including any storage lockers, cabinets, sheds, closets or outbuildings at this location (**SUBJECT PREMISES THREE**) and as further described in Attachment A-3, incorporated herein by reference.

d.   The residence of GOICOCHEA located at 1101 S. Minnie Street, Apt.1, Santa Ana, California, including any storage lockers, cabinets, sheds, closets or outbuildings at this location (**SUBJECT PREMISES FOUR**) and as further described in Attachment A-4, incorporated herein by reference.

## V.    COMPUTER DATA

9.    Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that

9

destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would completely fill a 35' x 35' x 10' room to the ceiling. Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames

10

and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

## VI.   ITEMS TO BE SEIZED

10. Based on the foregoing, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 21, United States Code Sections 846 and 841(a)(1), exist and can be found at the SUBJECT PREMISES, re-alleged in Attachment B and incorporated herein:

a. Narcotic drugs and controlled substances, including cocaine, crack cocaine, methamphetamine, drug paraphernalia, pipes, cutting agents and solvents, measuring

11

devices and weighing devices, scales, sieves, strainers, testing devices, plastic, tinfoil, cellophane, jars, plastic bags, containers, pill presses, paper bindles, glass vials, razor blades, mirrors, straws and other inhaling devices, rubber gloves, and other items used in the packaging of controlled substances.

b.   Quantities of cash in excess of $1,000.

c.   Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the price, quantity and/or times when narcotics were obtained, transferred, imported, sold, distributed, and/or concealed.

d.   Bank account records, wire transfer records, bank statements, safe deposit box keys and records, income tax returns, financial records and notes showing payment, receipt, concealment, transfer, or movement of money, and financial instruments purchased with amounts of currency or $1,000 or more, including travelers checks, bonds, stock certificates, cashier's checks, and certificates of deposit, all limited to the period of January 1, 2006 to the present.

e.   Telephone paging devices, beepers, mobile telephones, Blackberry devices, car telephones, and other communication devices.

12

f.    Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, personal notes, photographs, film, undeveloped film, videotapes, audiotapes, and other items reflecting names, addresses and telephone numbers, communications, and/or association with other individuals involved or believed to be involved in drug trafficking activities.

g.    Money wrappers, rubber bands, money containers, money counting machines, boxes, bags, briefcases, suitcases, or containers used to carry large amounts of currency or controlled substances.

h.    Records, documents, and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items, and the keys to any such real estate, vehicles, or safe deposit boxes, all limited to the period of January 1, 2006 to the present.

i.    Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, cancelled checks, maps, and written directions to locations, all limited to the period of January 1, 2006 to the present.

j.    Indicia of occupancy, residency, or ownership of the premises and things described in this warrant including utility bills, telephone bills, loan payment receipts, rent

13

receipts, trust deeds, lease or rental agreements, escrow documents, cancelled envelopes and keys, and bank account records, all limited to the period of January 1, 2006 to the present.

k.   Handguns, shotguns, and other firearms.

l.   As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form.  This includes any electronic device capable of data processing (such as central processing units, laptop or notebook computers, personal digital assistants, and wireless communication devices such as telephone paging devices, beepers, and mobile telephones); peripheral input/output devices (such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media); related communications devices (such as modems, cables, and connections); storage media, as defined below; and security devices, also as defined below.

m.   As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form.

n.   In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following

14

procedure:

i.    Upon securing the premises, law enforcement personnel trained in  searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices.

ii.    If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

iii. If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer personnel will determine whether it is practical to copy the data contained on the computer devices during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve that data.  If it is practical, and the computer devices cannot be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the computer

15

personnel will make a copy of the data contained on each computer device (a "data image") during the execution of this search and shall seize the data images rather than the computer devices themselves.

iv.    If the computer personnel determine it is not practical to perform an on-site search of the computer devices or make an on-site data image within a reasonable period of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

v.    In searching the computer devices or data images, the computer personnel may examine all of the data contained in the computer devices or data images to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

vi.    If the computer personnel seize the computer devices pursuant to subparagraph iv above or make a data image

16

pursuant to subparagraph iii above, the computer personnel will initially search the computer devices or data images within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant. If, after conducting such an initial search, the case agents determine that a computer device or data image contains any data falling within the list of items to be seized pursuant to this warrant, the government will either (1) return the computer device, keeping a data image for further analysis, provided that, prior to such return, the owner and user(s) of the computer device stipulate individually and in writing to the authenticity and accuracy of the data image or (2) seek an order of the Court allowing the government to retain the original computer device for further analysis. If a computer device or data image does not contain any data falling within the list of the items to be seized pursuant to this warrant, the government will return the computer device or delete the data image. If the government needs additional time to determine whether the computer device or data image contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty day period from the date of execution of the warrant.

o.   In order to search for data that is capable of being read or interpreted by a computer, law enforcement

17

personnel will need to seize and search the following items, subject to the procedures set forth above:

i.   Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

ii.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.  Any physical keys, encryption devices,

18

dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## VII. IDENTIFICATION AND EXPERTISE

11. Throughout this affidavit, unless otherwise noted, when I identify subjects intercepted in telephone calls, I base these identifications on the following: (1) the person identifies himself/herself by the first name or nickname of the person I identified them as; (2) the calls are usually to or from a telephone that I learned through the investigation that these persons use; (3) surveillance, following up on intercepted calls between the persons I identify, have seen these persons undertaking the activity they indicated on the telephone conversation that they would do; and/or (4) other investigation done, including a review of telephone subscriber records.

12. In this affidavit, unless otherwise noted, when I give my opinion of the meaning of an intercepted call or the coded language used in a call, or when I say I believe or know something about the language used by drug traffickers, I base my opinion on the following:

a. What I have learned while participating in, and conducting narcotic investigations about the coded language that

19

drug traffickers use, and the manner in which drug traffickers talk when conducting drug activities. Specifically, what I have learned from investigations that involved the interception of wire communications of drug traffickers, the consensual monitoring and recording of conversations between confidential sources and drug traffickers; and

b. What I have learned about VERA, A. VERA, and their associates during this investigation, i.e., the manner in which the organization operates, and the language and code words that members of the organization use while speaking on the telephone. During the time that SAGTF intercepted calls over telephones used by VERA, A. VERA, and their associates, I have heard subjects use coded language and I have subsequently corroborated or determined the meaning of the coded language by events observed during surveillance or by information obtained from confidential informants, law enforcement personnel and my own training and experience.

c. Further, when I describe the calls included herein, my description is based on what has been told to me by a Spanish linguist who has listened to all of the phone calls and related to me what was said in the calls.

13. Based upon my training, experience, and participation in other investigations involving controlled substances, I know that:

20

a.   narcotics traffickers and manufacturers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, manufacture, sale, and distribution of controlled substances;

b.   narcotics traffickers often "front" (provide on consignment) narcotics to their clients and therefore keep records of drug debts;

c.   the aforementioned books, records, receipts, notes, ledgers, etc. are vital to the orderly operation of a narcotics enterprise; therefore, they are maintained where the narcotics traffickers have ready access (this can include their residences, stash pads, residences of family members, vehicles, places of business and safe deposit boxes) to them and are often kept for months or years at a time;

d.   it is common for drug dealers to secrete contraband, records of drug transactions, large amounts of currency, financial instruments, precious metals, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in narcotics trafficking activities in secure locations in their residences, the residences of family members, or the curtilage of these residences (including in

21

garages, storage containers, and vehicles located on such premises and in vehicles they are known to drive and use) and in their businesses for ready access and to conceal them from law enforcement, and also to secrete them in secure off-site locations such as safe deposit boxes;

e.   narcotics traffickers commonly maintain addresses and/or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

f.   narcotics traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product, and these traffickers usually maintain these photographs in their residences, the residences of family members, and/or businesses;

g.   narcotics traffickers commonly use the proceeds from the sale of controlled substances to purchase assets, such as real property or motor vehicles, and often list these assets in fictitious names or the names of family members and friends in an attempt to hide the assets from seizure by law enforcement;

h.   narcotics traffickers commonly utilize telecommunication devices to further their illegal operations, including telephones, mobile telephones, cellular telephones, Blackberry devices, and digital paging devices and I know that evidence of association with other narcotics traffickers and/or

22

gang members can be found on these items;

i.    narcotics traffickers commonly use handguns and other firearms to protect themselves, their contraband, and the proceeds from their drug trafficking activities;

j.    sophisticated narcotics traffickers keep records of their narcotics debts and activities and often maintain these records in computers or in other electronic forms, specifically financial documentation is routinely maintained on personal computers; and

k.    individuals who amass proceeds from illegal activities such as narcotics trafficking routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc.  Records of such instruments are routinely maintained at the individual's residence, the residence of a family member, or place of business and are maintained for long periods of time.  They also do not report narcotics proceeds to the IRS which can be seen from a review of their filed income taxes that are also maintained at the individual's residence, the residence of a family member, or place of business and are maintained for long periods of time.

14.    I make this affidavit, in part, on personal knowledge

23

derived from my participation in this investigation and, in part, upon information from the following sources:

a. Surveillance of suspects by Special Agents ("SA") and Task Force Officers ("TFO") of the FBI, SAGTF, ATF, and other federal, state and local law enforcement officers;

b. A review of relevant reports and conversations with investigators regarding this case;

c. A review of telephone call records, pen register records, and subscriber information;

d. Communications intercepted pursuant to federal court-authorizations in California from approximately May 9, 2008 to the present over various communication facilities used by the Targets; and

e. Information received from automated systems maintained by the DEA, the California Department of Justice, the California Department of Motor Vehicles ("DMV"), the FBI, and Immigration and Customs Enforcement ("ICE"), as well as publicly available information databases, including Choicepoint.

15. Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by law enforcement officers. Since this affidavit is being submitted for the limited purpose of seeking arrest warrants and search warrants for the Targets, I have not set forth each and every fact learned during the course of this investigation.

24

Facts not set forth herein are not being relied upon in reaching my conclusion that arrest warrants and search warrants should be issued.

## VIII. TITLE III INTERCEPTIONS OF CERTAIN TELEPHONE NUMBERS

16.   A court-authorized Title III wire intercept of several cellular telephones used by subjects of the investigation was the crux of this investigation.  The Title III intercepts conducted in the Central District of California were initiated on May 9, 2008 and are expected to continue until execution of the arrests in this matter which I anticipate to be October 16, 2008.  The following details the orders authorizing the wire interception of the relevant cellular telephones:

a.   On or about May 9, 2008, the Honorable James V. Selna, Central District of California, signed an order in SA CR 08-17, authorizing the initial interception of telephone number (714) 728-2445 (hereinafter referred to as Target Telephone #1), used by VERA, for a period of thirty days.  Interceptions pursuant to the order began on May 9, 2008 and continued until June 6, 2008 when a continued order for interception was obtained.

b.   On or about June 6, 2008, the Honorable James V. Selna, Central District of California, signed an order in SA CR 08-17(A), authorizing the continued interception of Target Telephone #1, used by VERA, for a period of thirty days.

25

Interception continued pursuant to the order of June 6, 2008 and terminated on July 5, 2008.

c.   On or about July 10, 2008, the Honorable James V. Selna, Central District of California, signed an order in SA CR 08-17(B), authorizing the initial interception of telephone number (714) 605-2903 (hereinafter "Target Telephone #2"), believed to be used by A. VERA, and a juvenile relation (hereinafter "JUVENILE") and telephone number (714) 605-9265 (hereinafter "Target Telephone #3"), believed to be used by JUVENILE, for a period of thirty days.  Interception began on July 10, 2008 and terminated on August 9, 2008.

d.   On or about August 19, 2008, the Honorable James V. Selna, Central District of California, signed an order in SA CR 08-17(C), authorizing the renewed interception of Target Telephone #1, used by VERA, for a period of thirty days. Interception began pursuant to the order on August 19, 2008 and continued until September 16, 2008 when a continued order for interception was obtained.

e.   On or about September 16, 2008, the Honorable James V. Selna, Central District of California, signed an order in SA CR 08-17(D), authorizing the continued interception of Target Telephone #1, used by VERA, and the initial interception of telephone number 714-716-9091(hereinafter "Target Telephone #4") used by A. VERA, for a period of thirty days.  Interception

26

continued for Target Telephone #1 and began for Target Telephone #4 on September 16, 2008 and is expected to terminate for both telephones on or about October 15, 2008.

IX. **PROBABLE CAUSE**

A. **Summary of Investigation/Overview of the Minnie Street Lopers Gang**

17. The SAGTF has been investigating the narcotics trafficking activities inside a condominium complex area in Santa Ana, California known as Bishop Manor since approximately March 2007. Specifically, SAGTF has been focusing the investigation on VERA, a high ranking member of the Minnie Street Lopers gang and a drug dealer within the Bishop Manor complex.

18. Bishop Manor is a high density condominium complex mainly comprised of Mexican, Vietnamese and Cambodian immigrants. It is located in the southeast portion of the City of Santa Ana. It is bordered by Standard Street to the west, Camile Street to the north, Grant Street to the south and the railroad tracks to the east. Bishop Manor has three separate addresses within the complex: 1001 E. Camile Street, 1000 E. Bishop Street, and 1001 E. Grant Street. 1001 E. Camile has 9 buildings that are lettered A through I. 1000 E. Bishop has 23 buildings that are lettered A through X. 1001 E. Grant has 9 buildings that are lettered A through I. Each building in Bishop Manor contains 4 dwellings that are numbered 1 through 4. There are a total of 41 buildings that contain a total of 164 dwellings.

27

19.  Bishop Manor has been occupied by the Minnie Street Lopers gang for the last 20 years.  The Minnie Street Lopers control the narcotics trade in Bishop Manor.  The Minnie Street Lopers gang use their influence to cause fear and intimidation on the citizens of Bishop Manor.  This influence allows the Minnie Street Lopers gang members and their protected drug dealers to sell narcotics freely in Bishop Manor without fear of citizens calling the police.  Protected drug dealers are individuals who are not Minnie Street Lopers gang members, but pay taxes to the Lopers or purchase their drug supply from the Lopers.  The protected dealers are then able to sell narcotics without any problems from gang members in the area of Bishop Manor.

20.  Based on the investigation to date, my training and experience, and my conversations with other law enforcement officers, I believe the following regarding the narcotics trafficking activities inside Bishop Manor and about the Minnie Street Lopers gang:

a.  The Lopers criminal street gang is a traditional, turf-oriented, Hispanic street gang, located in the City of Santa Ana.  During the 1970s and early 1980s, a growing number of immigrant drug dealers were victimized by the established Santa Ana gangs.  These drug dealers were robbed of their drug money, assaulted, and murdered by other gang members coming into the areas in the southeast end of Santa Ana.  Eventually these

28

individuals solicited local males, who began protecting the drug dealers selling in the neighborhood.  These males banded together to form the Lopers criminal street gang.

b.   It is believed that there are approximately 423 documented members and associates in seven different factions of the Lopers criminal street gang.  These factions operate separately, but will still support and back each other as Lopers regardless of which faction they are from.  Each of these factions is known to use violence in an attempt to protect their territory.  These factions include are: the 5th Street Lopers, the 2nd Street Lopers, the Minnie Street Lopers, the Madison Park Lopers, the Pine Street Lopers, the Chestnut Street Lopers, and the Cedar Street Lopers.  The primary targets of this investigation belong to the faction of the Lopers gang known as the Minnie Street Lopers.

c.   The Minnie Street Lopers actively participate in narcotics trafficking, extortion of non-gang drug dealers, and crimes of violence, including: assault and battery, assault with deadly weapons, and murder, all done to enhance the reputation of the gang and to protect their territory from encroachment of other gangs.

d.   This investigation focused on Salvador VERA.  VERA is a high ranking member of the Minnie Street Lopers who oversaw much of the narcotics trafficking activities within the Minnie

29

Street Lopers territory, and more specifically, within the Bishop Manor complex.  SAGTF obtained authorization to intercept communications over a telephone used by VERA (Target Telephone #1), telephones used by his brother and fellow high-ranking member of the Minnie Street Lopers gang, A. VERA (Target Telephones #2 and #4), and another phone that their associates used (Target Telephone #3).

e.    During the period of interception, SAGTF determined that VERA and his brother A. VERA were major narcotics distributors in the Bishop Manor area.  VERA and A. VERA obtained cocaine base from CAMACHO and in turn distributed the cocaine base to other narcotics associates who would then sell cocaine base.  VERA and A. VERA also sold heroin and cocaine to other narcotics distributors.

f.    As part of the investigation, SAGTF also directed controlled buys of narcotics by CI #1 and CI #2 from various associates of the Minnie Street Lopers who were involved in the narcotics trafficking activities of VERA and A. VERA and within Bishop Manor and elsewhere.

B.    **Confidential Informants**

21.   Confidential Informant #1 ("CI #1")

a.    In or about March of 2007, an individual was detained for a parole violation and trespassing by Santa Ana Police Officers.  At the time of the detention, it was determined

by the parole officer that a parole hold was not warranted. During the detention, the individual expressed interest in becoming a confidential informant.

b.    CI #1 is cooperating in exchange for consideration on his state parole violations stemming from his arrest in March 2007 and CI #1 is receiving financial benefits for his cooperation from SAGTF.  CI #1 is an also admitted narcotics user.  Further, CI #1 is a documented gang member of the TFK (Time For Krime, Too Fucking Krazy) gang and is considered an associate of the Minnie Street Lopers gang because CI #1 grew up in their territory.

c.    CI #1 also has an extensive criminal history.  CI #1 has a felony 2006 conviction for burglary and possession of stolen property, for which CI #1 received 16 months in state prison and for which CI #1 is currently on state parole.  CI #1 has a 2005 felony conviction for possession of stolen property. CI #1 has a 2005 misdemeanor conviction for possession of narcotics paraphernalia.  CI #1 has a 2001 misdemeanor conviction for false identification to a peace officer and a 1999 misdemeanor conviction for false identification to a peace officer.  CI #1 has a 1998 felony conviction for auto theft.  CI #1 has a 1997 misdemeanor conviction for battery on a noncohabitating spouse.  CI #1 has a 1995 misdemeanor conviction for carrying a concealed weapon.

31

d.    CI #1 has been arrested on three occasions while acting as an informant during this investigation.  Two of the arrests have been for parole violations and one for vandalism. In December of 2007, CI #1 was arrested for a parole violation for which he served two months.  In April 2008, CI #1 was arrested for parole violation for which he served one and a half months.  Both parole violations involved CI #1 testing positive for narcotics.  In August of 2008, CI #1 was arrested for vandalism by the Garden Grove Police Department.  The CI had placed approximately fifteen stickers on city light poles.  The District Attorney's office refused to file any charges.  It should be noted that CI #1 did not receive any benefit or consideration for any of the three arrests.

e.    The information provided to the Santa Ana Gang Task Force thus far by CI #1 has been both accurate and reliable and has resulted in nine controlled purchases of narcotics and firearms from various narcotic dealers related to this investigation.  CI #1 has also provided information that has resulted in several seizures of heroin, methamphetamine, and firearms.  CI #1 has not provided the Santa Ana Gang Task Force with inaccurate information.

22.  Confidential Informant #2 ("CI #2")

a.    In or about January of 2008, an individual contacted TFO Johnny Franks and expressed interest in becoming a

32

confidential informant (CI #2).  CI #2 was not under arrest or police detention during this time.  CI #2 is currently not on probation or parole and is not requesting any consideration on any pending criminal investigations in exchange for his cooperation.

b.    CI #2 is a paid informant.  CI #2 has been paid by ATF and FBI for information and undercover work related to this and other investigations.

c.    CI #2 has a criminal history.  In 2004, CI #2 received a misdemeanor conviction for driving with a suspended license for which he received 36 months of probation.  In 2004, CI #2 received a misdemeanor conviction for possession of a controlled substance for which he served 15 days in jail.  In 2003, CI #2 received a misdemeanor conviction for violation of a court order to prevent domestic violence for which he received 36 months probation and 6 days in jail.  In 1999, CI #2 received a misdemeanor conviction for vandalism for which he received two years probation.

d.    CI #2 has been arrested/detained on three occasions while acting as an informant during this investigation. CI #2 was arrested on April 30, 2008 by the Tustin Police Department after .69 grams of methamphetamine and two pipes were discovered in CI #2's vehicle during a traffic stop.  The District Attorney's Office declined to press charges against CI

33

#2 for this incident. CI #2 was also involved in a traffic stop on May 9, 2008 by the Santa Ana Police Department. CI #2 was a passenger in the car and cooperated with the officers. The driver, however, fled the scene once the car was stopped. The vehicle was searched and several grams of what appeared to be methamphetamine were found in the glove compartment of the vehicle. CI #2 denied any knowledge of the methamphetamine and no charges were filed against CI #2. On August 24, 2008, CI #2 was arrested for a misdemeanor forgery warrant by the Costa Mesa Police Department. Costa Mesa Police Officers conducted a traffic stop on CI #2 and found an outstanding misdemeanor forgery warrant that had been issued one week prior. The forgery occurred in December of 2007 in Santa Ana. CI #2 was later cited and released. CI #2's court proceedings are currently pending. I do not believe that any of these incidents affect CI #2's credibility as the information he has provided has proven reliable thus far.

e.   CI #2 was threatened by an individual during the investigation who accused CI #2 of being a confidential informant and providing information to the police. Based on the threat, SAGTF paid to move CI #2 into an apartment and SAGTF is continuing to pay the rent on that apartment for CI #2's safety.

f.   CI #2 has provided SAGTF with reliable information throughout the investigation regarding various criminal

34

activities, including the unlawful sale of firearms and controlled substances. Said information has been independently corroborated and CI #2 has proven to be extremely reliable. CI #2 has purchased narcotics and firearms at the direction of the SAGTF. Based on the purchases made by CI #2, search warrants have been obtained and subsequently served. The search warrants have resulted in the seizure of firearms, narcotics, and money which was derived from narcotics sales. Arrests were made at the locations where the warrants were served. CI #2 also provided information about the layout of the residences where the warrants were served and about where contraband may be found inside of the residences. This information was proven to be very reliable.

C.    **Summary of the Conspiracy**

23. As indicated above, this investigation focused on the narcotics trafficking activities within the Bishop Manor area of Santa Ana, specifically the territory of the Minnie Street Lopers. One of the Minnie Street Lopers gang leaders is VERA. VERA, along with A. VERA, organize the drug sales in the Bishop Manor area and control the extortion or allowance of the non-gang member drug dealers in this area. VERA is also subject to extortion from more higher-ranking gangs because of the narcotics organization he is running in the Bishop Manor area. A. VERA is considered to be VERA's second-in-command of the Minnie Street Lopers and assists VERA in the narcotics trafficking activities

35

of the gang.  J. HIGAREDA and BARRAGAN are non-gang member drug dealers who are protected by the Minnie Street Lopers gang members.  This allows them to sell drugs in the territory claimed by the Minnie Street Lopers.  OREJEL is a member of the gang and sells narcotics on behalf of VERA and his associates.  E. MONDRAGON and S. MONDRAGON assist OREJEL with his illegal drug trafficking business.  VERA and his associates are supplied narcotics from CAMACHO, specifically cocaine base.  AHUMADA and DUARTE assist VERA in the distribution of the narcotics by delivering and selling narcotics.  STEWART and CHEBOTAREV are buyers of VERA's narcotics that then further distribute narcotics outside of the Bishop Manor area.

D.  **A. VERA Sells Heroin to CI #1**

24.  On February 27, 2008, CI #1 conducted a controlled purchase of 26 grams of heroin from A. VERA at the direction of the SAGTF.

a.  At the direction of the SAGTF, CI #1 dialed (714) 728-9925 and made a consensually recorded phone call to A. VERA.  CI #1 ordered a "Pantalone" from A. VERA for $350.  A. VERA agreed.  "Pantalone" is a code word used by A. VERA and his associates for one ounce of heroin.  CI #1 was given $2000 U.S. Currency and a recording device.

b.  At approximately 8:17 p.m., CI #1 was dropped off near the Bishop Manor apartment complex by TFO Franks.  CI #1

36

was seen walking into the area.  CI #1 then met with A. VERA.

c.   A. VERA gave CI #1 a clear plastic baggie containing a black tar-like substance and CI #1 provided A. VERA with $350.  This meeting was recorded.  CI #1 walked out of Bishop Manor and was picked up by TFO Franks at approximately 8:52 p.m.  CI #1 gave the substance and the remaining money, approximately $1,650, to TFO Franks.  TFO Franks field-tested the substance and it tested positive for heroin, weighing approximately 26 grams.

**E.   <u>BARRAGAN Sells Cocaine Base to CI #1</u>**

25.   On March 7, 2008, CI #1 conducted a controlled narcotics purchase of 27 grams of base cocaine from BARRAGAN.

a.   On March 6, 2008, CI #1 provided information to TFO Franks that BARRAGAN sold cocaine base.  TFO Franks directed CI #1 to see if BARRAGAN would sell cocaine base to CI #1.  At approximately 9:02 a.m., CI #1 informed TFO Franks that BARRAGAN would sell a half an ounce of cocaine base for $320.  TFO Franks directed CI #1 to order an ounce of cocaine base.  At approximately 9:50 p.m., CI #1 informed TFO Franks that the sale could happen for $600 the following day.

b.   On March 7, 2008, TFO Franks met with CI #1 who was on the telephone with BARRAGAN.  CI #1 was negotiating the price of one ounce of cocaine base.  BARRAGAN informed CI #1 that the price was $600 the day before, but that now it was $650.

37

They agreed on $640 and that the sale would occur in the Bishop Manor area. CI #1 was given $640 U.S. Currency and a recording device.

c. As TFO Franks was driving CI #1 to the meet, CI #1 received a call from BARRAGAN. CI #1 was instructed to call him back. At approximately 2:04 p.m., CI #1 made a consensually recorded call to (714) 914-0176 and spoke to BARRAGAN about the narcotics transaction.

d. CI #1 then walked into Bishop Manor and met with BARRAGAN. BARRAGAN told CI #1 to wait at BARRAGAN's residence within Bishop Manor while BARRAGAN met with the drug supplier. BARRAGAN left for five minutes. When he returned, he handed CI #1 a clear plastic baggie containing an off-white wafer-like substance. CI #1 walked out of Bishop Manor and handed TFO Franks the substance. TFO Franks field-tested the substance and it tested positive for cocaine base, weighing approximately 27 grams.

F.   **CAMACHO and SANCHEZ Sell Cocaine Base to CI #2**

26.   On March 20, 2008, CI #2 conducted a controlled narcotics purchase from SANCHEZ at the direction of the SAGTF.

a.   CI #2 called SANCHEZ and ordered cocaine base. CI #2 was directed to 300 E. 1st Street, Santa Ana, California to meet with SANCHEZ.

b.   At this location, SANCHEZ sold CI #2 seven grams

of cocaine base.

c. CI #2 was searched prior to and after the transaction and CI #2 turned over to SAGTF immediately afterwards the approximate seven grams of cocaine base that he received from SANCHEZ. It presumptively tested positive for cocaine base.

27. On April 10, 2008, CI #2 conducted a controlled narcotics purchase from SANCHEZ and CAMACHO at the direction of the SAGTF.

a. CI #2 called SANCHEZ and asked to purchase an ounce of cocaine base. CI #2 also asked her if she would introduce him to the cocaine base supplier that provided her with the narcotics.

b. SANCHEZ called the supplier and told CI #2 that the ounce of cocaine base would cost him $800.00 ($640.00 for the base cocaine and $160.00 for her). SANCHEZ charged CI #2 $160.00 for introducing him to the supplier.

c. After CI #2 gave SANCHEZ the $160.00, she called the supplier and set up the narcotics transaction. At the direction of SANCHEZ, CI #2 drove to 819 W. Washington and met with the supplier (CAMACHO). CAMACHO gave CI #2 approximately 29.2 grams of base cocaine in exchange for $630.00.

d. CI #2 was searched prior to and after the transaction and CI #2 turned over to SAGTF immediately afterwards the approximate 29.2 grams of cocaine base that he received from

39

CAMACHO. It presumptively tested positive for cocaine base.

28. On April 22, 2008, CI #2 conducted a controlled narcotics purchase from CAMACHO, brokered by SANCHEZ, at the direction of the SAGTF.

a. At approximately 2:45 p.m., CI #2 made a consensually monitored call to SANCHEZ at telephone number (714) 605-8487 at the direction of TFO Franks. CI #2 discussed obtaining the telephone number for SANCHEZ's cocaine base supplier from SANCHEZ. SANCHEZ told CI #2 that she wanted to make some money for giving CI #2 the telephone number. CI #2 told SANCHEZ he would call back when he was prepared to order the narcotics.

b. CI #2 called SANCHEZ back a short while later and ordered four ounces of cocaine base. SANCHEZ stated she would call her supplier and get back to CI #2. Shortly thereafter, SANCHEZ contacted CI #2 by phone and informed CI #2 that it would cost $2800 for the cocaine base and that she wanted $200 for brokering the deal. They agreed to meet at 6:00 p.m. to do the deal.

c. At approximately 6:15 p.m., CI #2 informed TFO Franks that he had just received a call from SANCHEZ who stated that they called their supplier "CAMACHO."

d. CI #2 was provided with $3,000 and given a digital recording device. CI #2 then drove to meet SANCHEZ at

40

approximately 6:31 p.m. at a predetermined location.  CI #2 was then observed to meet with SANCHEZ for a few minutes.

e.   Shortly thereafter, CI #2 called TFO Franks and advised him that SANCHEZ had given CI #2 the supplier's (CAMACHO's) telephone number, (714) 605-8649.  CI #2 then had several more conversations with CAMACHO by telephone and CAMACHO stated he could only provide one ounce of cocaine base that evening, but could get the rest the next day.

f.   At TFO Franks's direction, CI #2 met with CAMACHO at an area in front of 819 W. Washington Street in Santa Ana and purchased one ounce of cocaine base.  CAMACHO told CI #2 to call him "Primo" and that it would cost $675.  CAMACHO gave CI #2 a clear plastic sandwich baggie containing off-white wafer-like substance and CI #2 gave CAMACHO $700.  CAMACHO agreed to credit CI #2 with $25 when they did the deal the following day.  This meeting was digitally recorded.

g.   After the meeting, CI #2 provided the baggie to TFO Franks which field-tested positive for cocaine, weighing approximately 28.8 grams.

29.  On April 23, 2008, CI #2 conducted a controlled narcotics purchase from CAMACHO at the direction of the SAGTF.

a.   After CI #2 purchased narcotics from the supplier known as CAMACHO, aka "Primo," TFO Franks on April 23, 2008, conducted a records check of individuals residing on Washington

41

in the City of Santa Ana with the last name Camacho.  TFO Franks located a booking photograph of Javier Fernando CAMACHO who resided on Washington Street and compared the photo with the digital recording made by CI #2.  TFO Franks confirmed that CAMACHO was the supplier of cocaine base to CI #2 on April 22, 2008.

b.    At approximately 1:02 p.m., CI #2 made a recorded telephone call to CAMACHO at telephone number (714) 605-8649. CAMACHO agreed to provide CI #2 with three ounces of cocaine base at approximately 3:00 p.m.

c.    Pen register and trap and trace analysis shows that at approximately 7:51 p.m. CAMACHO, using telephone number (714) 605-8649, was in touch with Target Telephone #1, the telephone used by VERA.  I believe that this call was related to the narcotics transaction that CAMACHO was conducting and that had not yet occurred at the time of the telephone call.

d.    At approximately 8:17 p.m., CI #2 made a recorded telephone call to CAMACHO at telephone number (714) 605-8649. CAMACHO stated that he only had two ounces for sale and the price was $700 per ounce.  CI #2 agreed.

e.    CI #2 was provided with $1,400 and a digital recorder.  CI #2 then went to 819 W. Washington to meet with CAMACHO.  CI #2 met with CAMACHO in an alley for a few minutes. CAMACHO provided CI #2 with two small baggies and CI #2 provided

42

him with the $1400.

f.   CI #2 then met with TFO Franks at a predetermined spot and provided him with the baggies which field-tested positive for cocaine base, weighing a total of 56.9 grams.

### G.   J. HIGAREDA and OREJEL Sell Methamphetamine to CI #2

30.   On April 29, 2008, CI #2 conducted a controlled narcotics purchase from J. HIGAREDA and OREJEL at the direction of the SAGTF.

a.   CI #2 called J. HIGAREDA at the direction of SAGTF.  The phone call was recorded.  CI #2 requested to purchase an ounce of "glass" (a street slang term for methamphetamine) from J. HIGAREDA.  J. HIGAREDA told CI #2 he would call him back with a price.

b.   At approximately 6:00 p.m., J. HIGAREDA called CI #2 and told him the price for an ounce of methamphetamine would be $850.00.  CI #2 requested to purchase two ounces methamphetamine.  J. HIGAREDA told CI #2 to go to his house at 1001 E. Camile #D2, Santa Ana, California.

c.   At approximately 6:20 p.m., CI #2 and his vehicle were searched for contraband.  No contraband was found.  CI #2 was issued $1800.00 in government funds and an audio/video recorder.  At approximately 6:25 p.m., detectives followed CI #2 and watched CI #2 drive to 1001 E. Camile where he was no longer visible.

d.    While CI #2 was inside J. HIGAREDA's home, J. HIGAREDA called the methamphetamine supplier "Primo" via cell phone and asked if it was ready.  The supplier stated it would be ready in 15 minutes.  The supplier later called J. HIGAREDA and said it was ready.  At this time, CI #2 and J. HIGAREDA entered CI #2 vehicle and drove to the supplier's home.

e.    At approximately 6:55 p.m., CI #2 was seen in his vehicle exiting Camile and turning south on Standard.  CI #2 had a heavy set male passenger.  At Grant Street, CI #2 turned east and arrived at Minnie Street and was not no longer in view.

f.    CI #2 and J. HIGAREDA walked into the supplier's home.  (Later identified to be 1000 E. Bishop #U2).  While inside, the supplier gave CI #2 two plastic baggies containing an off white crystallized substance and CI #2 gave the supplier $1700.00.  The supplier introduced himself as "Ruben."  (Later identified as OREJEL).

g.    After the narcotics transaction, at approximately 7:15 p.m., CI #2 called SAGTF officers and stated he was in possession of the methamphetamine.  CI #2 further informed officers that J. HIGAREDA was walking to his home on foot.  CI #2 exited Bishop and SAGTF detectives followed him.

h.    At 7:25 p.m., CI #2 was met at the pre-designated area.  The recorder was deactivated and SAGTF took possession of two plastic baggies containing an off-white crystallized

44

substance which presumptively tested positive for methamphetamine.  A search of the CI #2 and his vehicle revealed no contraband.  CI #2 gave SAGTF the $100.00 left over from the narcotics transaction.

**H.    VERA and A. VERA Obtain Cocaine Base From CAMACHO**

31.  On May 13, 2008, SAGTF intercepted a call over Target Telephone #1 between VERA and A. VERA.  (Call 12)

a.    VERA said he was going to see "Primito" to find out if he would be able to get "some" (believed to be a reference to narcotics).  VERA then said he was at "Primito's" apartment complex and was going to talk to him.

b.    During this call, SAGTF was conducting surveillance and observed VERA exiting an apartment complex at 819 W. Washington, Santa Ana, California.  Based on prior narcotics transactions conducted at the direction of SAGTF between CI #2 and CAMACHO as described above, I know that this is CAMACHO's, aka "Primo" and "Primito," residence.

c.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that this call is in reference to VERA and A. VERA obtaining cocaine base from CAMACHO for them to sell in the Bishop Manor area.  I believe that VERA went to CAMACHO's residence and obtained cocaine base.  I further believe that CAMACHO is a main source of supply for cocaine base for VERA and

45

A. VERA.

32. On May 13, 2008, SAGTF intercepted a call over Target Telephone #1 between VERA and A. VERA.    (Call 22)

a.    A. VERA told VERA that people were calling him and they wanted to get "some."    VERA told A. VERA to tell George to give him a sample and if it is good, VERA and "Primo" will go there so "Primo" can "cook it."

b.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that in this call VERA is stating that he has various customers contacting him to obtain cocaine base and he needs to obtain cocaine base in order to sell it to his customers.    I further believe that in this call VERA is telling A. VERA to get a sample of cocaine from an individual known as George.    I believe that the reference to "cook it" means that if the cocaine is of good quality, VERA will have CAMACHO, his source of supply for cocaine base, convert the cocaine into cocaine base.    This would allow VERA a quantity of cocaine base that he and A. VERA could then sell.

I.    **VERA Directs GOICOCHEA to the Methamphetamine Supplier**

33. On May 18, 2008, SAGTF intercepted a call over Target Telephone #1 between VERA and GOICOCHEA

a.    GOICOCHEA called VERA and asked for "Ritchie's" number to get two ounces.    VERA told GOICOCHEA that the "stuff"

46

was trash and to call "Jorge" to get the "stuff."

b. Based on my training and experience, the context of the call, my familiarity with the investigation and in discussion with other experienced law enforcement officers, it is my opinion that GOICOCHEA was looking to purchase two ounces of methamphetamine and called VERA to get a phone number for "Ritchie" in an attempt to obtain the methamphetamine. I believe that this call demonstrates that VERA is aware of and directs the various narcotics being sold in the Bishop Manor area. VERA and A. VERA do not generally sell methamphetamine themselves, but they are in control of the narcotics being sold in their territory.

### J.    VERA Delivers Narcotics to STEWART

34. On May 23, 2008, SAGTF intercepted a call over Target Telephone #1 between VERA and STEWART. (Call # 1041)

a. During the call, STEWART asked VERA where to meet. STEWART suggested they meet on Culver (a street located in Irvine, California). STEWART then told VERA "1-50" and "1-50". VERA responded "We're talking on my phone." STEWART then responded "Oh, oh..all right. Like 150 people at the party."

b. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that in this call STEWART is ordering a quantity of narcotics (1-50) from VERA. VERA reminded STEWART

47

during the call that they were talking on his phone and STEWART attempted to conceal the narcotics order by saying "150 people at the party." I believe that she attempted to speak in a coded language in order to avoid law enforcement detection.

c. I believe that STEWART's reference to "1-50" is a reference to either heroin or cocaine base. As described further in this affidavit, STEWART regularly purchased distributable amounts of narcotics from VERA, A. VERA and their associates.

d. At approximately 11:00 a.m., based on the intercepted call detailed above, surveillance was conducted by law enforcement at CVS Pharmacy located at 14330 Culver Drive, Irvine, California. At approximately 11:50 a.m., law enforcement observed VERA drive into a parking lot off Culver Drive in Irvine and meet with a female. VERA was the driver and sole occupant of a lime green Chevy Tahoe with 24 inch rims. At approximately the same time as VERA arrived, law enforcement observed a Black Infiniti with California License plate 4VLP657 enter the parking lot. A light-skinned female with dark curly hair was driving and was the only occupant of the vehicle.

e. Law enforcement observed the female park the Infiniti and exit. The female then walked to the passenger side of VERA's car where she stood for 15-20 seconds. VERA then departed the area and was last observed driving north on Culver Drive. The female returned to her Infiniti and remained in her

48

car for five minutes before departing.  Law enforcement followed the vehicle as it drove southbound on the 5 Freeway.  It exited the Freeway at Avenidia Pico in San Clemente, California and surveillance was terminated.

f.    Agents ran a records check for the license plate of the Infiniti the female was driving.  According to CA DMV records, the registered owner is Robert B. Stewart, 112 Nantucket Lane, Aliso Viejo, California 92656.  Agents also obtained a photograph of an individual known as Sarah Cate Stewart from the CA DMV, with the same address as the registered owner of the Infiniti, and determined that the photograph matched the female driving the Infiniti that met with VERA.

K.    **VERA Directs a UM to Contact A. VERA to Obtain Cocaine**

35.    On May 24, 2008, SAGTF intercepted a call over Target Telephone #1 between VERA and an unknown male ("UM").  (Call # 1164)

a.    The UM called VERA and asked if VERA could have someone bring the UM some "Blanca."  VERA instructed the UM to call his brother "Armando" (A. VERA) at Target Telephone #2.

b.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I know that the term "blanca" is a Spanish slang term used by narcotics traffickers and users to refer to cocaine.  I also believe that the reference to "Armando" is a reference to

49

VERA's brother A. VERA.   I know that A. VERA and VERA sells narcotics, including heroin, cocaine and cocaine base, and that A. VERA was using Target Telephone #2 during the investigation to direct the sale of illegal drugs.

**L.   AHUMADA Delivers Narcotics to STEWART at VERA's Direction**

36.   On May 29, 2008, SAGTF intercepted call over Target Telephone #1 between VERA and STEWART (Call # 1695) and VERA and AHUMADA (Call 1701).

a.   During a conversation between VERA and STEWART, STEWART asked VERA for "2 and 2."

b.   Shortly thereafter, AHUMADA called VERA.   VERA told AHUMADA that they were going to run an errand.

c.   Approximately an hour later, SAGTF conducted surveillance at the intersection of Culver Drive and Walnut in Irvine, California.   STEWART was observed in the parking lot area.   She was observed going into the Wells Fargo Bank and then conducting a transaction.   She was observed exiting the bank.   A red pick up truck was then observed parking next to STEWART and meeting with STEWART.   The red pick up truck then departed the area and SAGTF followed.

d.   The truck drove to an auto body shop at the corner of Harbor and Camille in Santa Ana, California.   VERA and a Hispanic male were observed at the auto shop.   Approximately one hour later, the red truck left the shop.   A marked SAPD patrol

50

car conducted a traffic stop on the truck.  The driver was identified as Julio AHUMADA and the passenger was VERA.

e.   Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that STEWART again ordered a quantity of narcotics from VERA and that VERA directed AHUMADA to deliver the narcotics to STEWART at a pre-arranged location in Irvine, California.  Furthermore, I know that buyers and sellers of narcotics will meet in a public area such as a parking lot to conduct an illegal drug transaction so as to avoid law enforcement detection by attempting to blend in with a busy surrounding area.

**M.   GOICOCHEA Sells Methamphetamine to CI #2**

37.  On May 30, 2008, CI #2 conducted a controlled narcotics purchase from GOICOCHEA at the direction of the SAGTF.

a.   CI #2 attempted to order one ounce of methamphetamine from Roberto Higareda.  Higareda, however, told CI #2 to drive to his residence and Higareda would call his supplier.

b.   CI #2 drove to Higareda's residence (618 E. Hood, Santa Ana).  GOICOCHEA also arrived at Higareda's residence. GOICOCHEA was only in possession of 13 grams (half ounce) of methamphetamine.

c.   GOICOCHEA sold the 13 grams to CI #2 for $800.

GOICOCHEA gave CI #2 his cellular phone (714) 651-5548 in order for CI #2 and him to conduct future transactions.

d.   CI #2 was searched prior and after the transaction and CI #2 turned over to SAGTF immediately afterwards the approximate 13 grams of methamphetamine he received from GOICOCHEA.  It presumptively tested positive for methamphetamine.

**N.   OREJEL Sells Methamphetamine to CI #1**

38.   On June 5, 2008, CI #1 conducted a controlled narcotics purchase from OREJEL at the direction of the SAGTF.

a.   CI #1 had recorded conversations with OREJEL in which they negotiated a price of $820 for one ounce of methamphetamine.

b.   Later in the day, CI #1 called OREJEL's cell phone number and MONDRAGON answered.  MONDRAGON told CI #1 that OREJEL would be home later to conduct the transaction.

c.   CI #1 later went to the east alley of Bishop Manor and contacted OREJEL.  OREJEL provided CI #1 with 28 grams of methamphetamine for $820.

d.   CI #1 was searched prior and after the transaction and CI #1 turned over to SAGTF immediately afterwards the approximate 28 grams of methamphetamine he received from OREJEL. It presumptively tested positive for heroin.

**O.   GOICOCHEA Sells Methamphetamine to CI #2**

39.   On June 11, 2008, CI #2 conducted a controlled

narcotics purchase from GOICOCHEA at the direction of the SAGTF.

a.    CI #2 dialed (714) 651-5548, a number he was previously given by GOICOCHEA, and spoke to GOICOCHEA.  CI #2 and GOICOCHEA negotiated the sale of one ounce of methamphetamine for $1600.

b.    CI #2 met with GOICOCHEA in a parking lot at First and Main Street in Santa Ana.  GOICOCHEA approached CI #2 who was seated in his vehicle.  GOICOCHEA dropped a baggie on CI #2's front seat. CI #2 paid GOICOCHEA and left the area.

c.    CI #2 was searched prior and after the transaction and CI #2 turned over to SAGTF immediately afterwards the approximate 27 grams of methamphetamine he received from GOICOCHEA.  It presumptively tested positive for methamphetamine.

40.  On July 2, 2008, CI #2 conducted a controlled narcotics purchase from GOICOCHEA at the direction of the SAGTF.

a.    CI #2 called GOICOCHEA on his cell phone and asked to purchase one ounce of methamphetamine.  GOICOCHEA agreed to sell it for $1600.

b.    CI #2 met with GOICOCHEA in a parking lot at First and Main Street in Santa Ana.  GOICOCHEA approached CI #2 and told CI #2 that he didn't have the methamphetamine on him and asked if CI #2 wanted to follow him to pick it up.  GOICOCHEA also requested the $1600 up front.  CI #2 paid GOICOCHEA the money.

c.    CI #2 followed GOICOCHEA in a separate vehicle as they drove to the area of Fairview and Trask to meet up with GOICOCHEA's supplier.

d.    CI #2 parked his vehicle in a parking lot while CI #2 observed GOICOCHEA meet with an individual nearby.  CI #2 could see them make a hand-to-hand exchange.

e.    GOICOCHEA then met up with CI #2, still in CI #2's vehicle.  GOICOCHEA dropped a baggie onto CI #2's passenger seat.

e.    CI #2 was searched prior and after the transaction and CI #2 turned over to SAGTF immediately afterwards the approximate 24 grams of methamphetamine he received from GOICOCHEA.  It presumptively tested positive for methamphetamine.

P.    **A. VERA Discusses Cocaine Base**

41.    On July 10, 2008, SAGTF intercepted a call over Target Telephone #2 between A. VERA and an individual identified as Victor. (Call # 3)

a.    Victor called A. VERA and told A. VERA that he had "rocks like the ones he asked for."  Victor then tells A. VERA that he made them "as thin as possible."

b.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that this call is referring to a prior request by A. VERA to obtain cocaine base from Victor.  Victor advised A. VERA during the call about the "rocks" he asked for.

I know that "rocks" is a term narcotics traffickers and users use to describe cocaine base, also known as rock cocaine. Victor further advises A. VERA that he has made the cocaine base as "thin as possible." I know that narcotics traffickers often make cocaine base to be "thin" like a wafer before selling it. During the course of this investigation, CI #2 has made controlled purchases of "rock" cocaine during the course of this investigation that were "thin" like a wafer.

Q.   **A. VERA and DUARTE Distribute Cocaine**

42.   On July 10, 2008, SAGTF intercepted a call over Target Telephone #2 between A. VERA and DUARTE. (call 23)

a.   DUARTE asked A. VERA for a "20" of coke. A. VERA told DUARTE that he will bring it to DUARTE.

b.   Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that this is a narcotics related phone call. I believe that when DUARTE asks for a "20" of coke, I believe DUARTE is asking A. VERA for $20 worth of cocaine. I also believe that DUARTE was going to deliver this to a buyer. I know that DUARTE works on behalf of A. VERA in distributing and assisting in the distribution of narcotics.

c.   DUARTE uses telephone number (714) 398-7568 when he calls A. VERA. Telephone subscriber records show that the phone is subscribed to Maria Aguillon, 1000 E. Bishop, Unit D2,

Santa Ana, California.   According to CA DMV records, DUARTE resides at 1000 E. Bishop, Unit D2, Santa Ana, California. Additionally, CI #1 identified DUARTE as a narcotics runner for A. VERA.

43.   On July 11, 2008, SAGTF intercepted a call over Target Telephone #2 between A. VERA and DUARTE.   (Call # 198)

    a.   DUARTE told A. VERA that he had a "two bill client."   A. VERA said he will be right there.

    b.   Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe DUARTE is describing a customer to A. VERA who is looking to buy $200 worth of narcotics.   I believe that the phrase "two bill client" means $200 worth of narcotics.   I also believe this call shows that DUARTE contacts A. VERA when he gets a customer demonstrating that DUARTE works at A. VERA's direction.

44.   On July 11, 2008, SAGTF intercepted a call over Target Telephone #2 between A. VERA and DUARTE.   (Call # 204)

    a.   DUARTE told A. VERA that he had a client who wants "coke."   A. VERA affirmed and told DUARTE that he was going to take it to him right now.

    b.   Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe DUARTE is letting A. VERA know of a

customer who is looking to buy cocaine. I again believe that this call shows that DUARTE reporting into A. VERA when he gets a customer demonstrating that DUARTE works at A. VERA's direction.

### R.    A. VERA Directs the Distribution of Heroin

45.    On July 11, 2008, SAGTF intercepted a call over Target Telephone #2 between A. VERA and JUVENILE.   (Call # 130)

a.    A. VERA asked JUVENILE if she called because "she said she wanted a gram of coke. No, not coke, heroin, man, heroin and it's in the "tronquito."

b.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that "tronquito" is a Spanish term for tree trunk or log.  As discussed in more detail in the section regarding probable cause for **SUBJECT PREMISES ONE**, I know that A. VERA and VERA routinely hide narcotics in the tree trunks outside of **SUBJECT PREMISES ONE**.  I believe that A. VERA is directing JUVENILE to the tree where they hide narcotics that they plan to sell.  I believe that he is directing JUVENILE to obtain heroin from the tree to distribute it as directed.  I also know from the investigation and the many intercepted calls with JUVENILE, that A. VERA and VERA direct JUVENILE on a regular basis to retrieve and distribute narcotics on their behalf.

### S.    CHEBOTAREV Obtains Heroin From A. VERA

46.    On July 12, 2008, SAGTF intercepted a call over Target

57

Telephone #2 between A. VERA and CHEBOTAREV.  (Call # 270)

     a.   CHEBOTAREV called A. VERA and ordered "two pieces" for $550.00 from A. VERA.

     b.   Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that this is a narcotics related phone call.  I know that narcotics traffickers and users will cryptically refer to illegal drugs as "pieces."  In this call, I believe "pieces" refers to heroin and that A. VERA is going to sell two ounces of heroin to CHEBOTAREV for $550.00.  I know that the current cost of heroin ranges from $200-$300 an ounce.  I also know that A. VERA sells heroin.  Based on the prices and the amounts as set forth in the call, I believe that CHEBOTAREV ordered two ounces of heroin from A. VERA.

47.  On July 15, 2008, SAGTF intercepted a call over Target Telephone #2 between A. VERA and CHEBOTAREV.  (Call # 590)

     a.   CHEBOTAREV called A. VERA and ordered "two pieces" from A. VERA.  A. VERA stated that he would charge $650. CHEBOTAREV tried to negotiate the price down to $625 stating that since he is getting "two," CHEBOTAREV is trying to maximize what he can make by getting more.

     b.   Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that this is another call in which

58

CHEBOTAREV is ordering two ounces of heroin from A. VERA.  I believe that CHEBOTAREV ordered two ounces of heroin just days earlier for a lower price and that he was trying to negotiate a lower price for ordering another two ounces.  I also believe that CHEBOTAREV was trying to convince A. VERA to sell it to him for a lower price so that he could make more money when he turned around to resell it to narcotics users.

c.   I also know based on my training and experience and conversations with other law enforcement officers that one ounce of heroin ranges anywhere from 25-28 grams. Conservatively, a gram of heroin would yield four dosage units, .25 grams each, but that one gram can have as many as 10 dosage units, of .10 grams each.  It all depends on the purity of the heroin and the tolerance of the drug user.  Thus, 25 grams, could conservatively yield 100 dosage units of heroin, which is far more than a heroin user would keep.  Thus, I believe that because CHEBOTAREV ordered four ounces of heroin within a short period of time, coupled with his statements that he could "make more," that CHEBOTAREV was ordering the heroin to sell to narcotics users.

T.   **STEWART Buys Additional Narcotics to Distribute From A. VERA**

48.   On July 14, 2008, SAGTF intercepted a call over Target Telephone #3 between A. VERA and JUVENILE (Call # 511)

a.   A. VERA said that the "white stuff" was in the hole where German lives and there was some "black" stuff in the

tree/log. A. VERA then said that STEWART wanted "2" and told JUVENILE to put it on the scale and make sure the two are "point 9". A. VERA then told JUVENILE to make "four point 9 ones that make 200." A. VERA then said that VERA was going to meet STEWART because no one else was available.

b. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that this is a narcotics related phone call. I know from my training and experience that narcotics traffickers and users often refer to cocaine as "white stuff" based on it's color and heroin as "black" based on it's color. I further believe that the reference to German is a reference to German Yera who resides at **SUBJECT PREMISES ONE**. Furthermore, based on earlier intercepted calls, I know that VERA and A. VERA stash narcotics in holes and a tree at **SUBJECT PREMISES ONE**. I further believe that the reference to "four point 9 ones that make 200" refers to an amount of narcotics which cost approximately $200.00.

49. On July 15, 2008, SAGTF intercepted a call over Target Telephone #2 between A. VERA and STEWART. (Call # 590)

a. STEWART told A. VERA that she wanted "black and white." She also told A. VERA that about a week and a half prior she had one of her cousins get her a "clavo" from her uncle. She talked about the poor quality of the "white" she had been

getting, and that she would be spending "two" and that she only wanted "white." She then told A. VERA to just throw in some "black" to make it bigger. She complained to A. VERA that she was tired of getting the "shitty white" and that most of the time it's not for her.

b.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that STEWART is ordering cocaine and heroin form A. VERA in this call that she intends to use herself and distribute to others. I know that the terms "white" and "black" describe cocaine and heroin, respectively. I also know that a "clavo" is a slang term used by narcotics traffickers and users for an ounce of heroin. I further believe that when STEWART refers to spending "two" she is talking about two hundred dollars based on the context of the call.

c.    I also believe that STEWART is purchasing narcotics for resale. In the call, she stated that most of the time she is not buying the white, or cocaine, for herself, which I believe shows that she is distributing the cocaine to another person. I further believe that she obtained an ounce of heroin which ranges anywhere from 25-28 grams. Specifically, STEWART referenced that she had already obtained an ounce of heroin (a clavo) from her uncle. As indicated previously, I believe that 25 grams could conservatively yield 100 dosage units of heroin,

61

which is far more than a user would keep.

50. On July 15, 2008, SAGTF intercepted a second call from STEWART over Target Telephone #2 to VERA.

a. STEWART asked VERA who would be delivering the narcotics she had previously ordered through A. VERA. During the conversation, STEWART told VERA that she received a huge "clavo of tar" from her uncle. STEWART goes on to say she does not need "tar" right now because she has a "piece the size of her fist" which she bought from her uncle.

b. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that this call confirms that the previous call with A. VERA was in fact a narcotics call. I know that the term "tar" is also a slang for heroin because heroin itself resembles black tar.

U. **A. VERA and DUARTE Conspire to Distribute Cocaine Base**

51. On July 15, 2008, SAGTF intercepted a call over Target Telephone #2 between A. VERA and DUARTE. (Call # 584)

a. DUARTE asked A. VERA if he had any "piedra."

b. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I know that "piedra" is the Spanish term for "rock." I believe that DUARTE was calling A. VERA to see if he could obtain rock cocaine, base cocaine.

62

V.    **A. VERA Orders Cocaine Base From CAMACHO**

52.   On July 16, 2008, SAGTF intercepted a call over Target Telephone #3 between CAMACHO and A. VERA. (Call # 671)

a.    A. Vera asked if Camacho had any "jale." CAMACHO said he only had "one." A. VERA then asked CAMACHO if it was "white" or "yellow". A. VERA then asked for the "white" one. CAMACHO said he would call a guy to find out what kind he has.

b.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that this is a narcotics related phone call. The term "jale" is Spanish word for work and is often used by narcotics dealers as a slang term for possessing illegal drugs. I am also aware that narcotics dealers will cryptically refer to an amount of illegal drugs such as "one" when speaking on a telephone. Additionally, I know that the terms "white" or "yellow" refer to the appearance of "crack" cocaine. Based on the investigation, I know that CAMACHO is a supplier of crack cocaine. I believe that in this call, A. VERA was attempting to purchase one ounce of "crack" cocaine from CAMACHO.

W.    **MONDRAGON Sells Heroin to CI #2**

53.   On August 7, 2008, CI #2 conducted a controlled purchase of two ounces of heroin from MONDRAGON at the direction of the SAGTF.

a.   CI #2, who has purchased narcotics from Roberto Higareda in the past, contacted Higareda to purchase two ounces of heroin.  Higareda acted as the broker for the narcotics deal.

b.   CI #2 gave Higareda $560.00 for the heroin purchase.  While Higareda was parked at 800 S. Minnie, MONDRAGON arrived and entered Higareda's car.  MONDRAGON gave Higareda the heroin and Higareda gave Mondragon the $560.00 he had received from CI #2.  CI #2 had been close enough to observe this meeting.

c.   Higareda then told CI #2 to enter his car.  CI #2 took the heroin from Higareda's car and returned to his car.

d.   CI #2 was searched prior and after the transaction and CI #2 turned over to SAGTF immediately afterwards the approximate 2 ounces (56.95 grams) of heroin he received from MONDRAGON.  It presumptively tested positive for heroin.

## X.   OREJEL and MONDRAGON Sell Heroin to CI #1

54.   On August 26, 2008, CI #1 conducted a controlled purchase of over an ounce of heroin from MONDRAGON at the direction of the SAGTF.

a.   CI #1 called MONDRAGON and requested a "pantalon" (a street slang for an ounce of heroin) plus six "buttons" (a street slang term for a gram of heroin).  MONDRAGON told CI #1 the price for the heroin is $320.00 ($220 for the ounce and $100 for the six grams).

64

b. CI #1 went to the east alley of Bishop Manor to purchase the heroin and OREJEL arrived with the heroin. OREJEL gave CI #1 33.38 grams of heroin and CI #1 gave OREJEL the $320.00.

c. CI #1 was searched prior to and after the transaction and CI #1 turned over to SAGTF immediately afterwards the approximate 33.38 grams of heroin he received from OREJEL and MONDRAGON. It presumptively tested positive for heroin.

**Y. OREJEL, MONDRAGON, and S. MONDRAGON Sell Heroin to CI#2**

55. On September 23, 2008, CI #2 conducted a controlled purchase of five ounces of heroin from OREJEL, MONDRAGON, and S. MONDRAGON at the direction of the SAGTF.

a. CI #2 called Edgar MONDRAGON and requested a "mano" (street slang term for five ounces of heroin). CI #2 was instructed to go to 1000 E. Bishop, #U2 (**SUBJECT PREMISES THREE**).

b. CI #2 knocked at the front door of **SUBJECT PREMISES THREE** and OREJEL answered. CI #2 asked OREJEL for the five ounces of heroin. OREJEL's wife, S. MONDRAGON, left and later returned with the five ounces of heroin. S. MONDRAGON gave the five ounces of heroin to OREJEL and OREJEL gave the five ounces of heroin to CI #2. CI #2 gave OREJEL $1200.00. This was all digitally recorded.

c. CI #2 was searched prior and after the transaction and CI #2 turned over to SAGTF immediately afterwards the

65

approximate 5 ounces (140 grams) of heroin he received from OREJEL and S. MONDRAGON.  It presumptively tested positive for heroin.

Z.    **A. VERA and CAMACHO Sell Cocaine Base to CALDERON**

56.  On September 23, 2008, SAGTF intercepted a call over Target Telephone #4 between CAMACHO and A. VERA.  (Call # 593)

a.    During the call, A. VERA ordered a "whole one" from CAMACHO.  A. VERA asked if he could get it for "8."  CAMACHO said he usually let guys have it for "8-40" but A. VERA could have it for "8."  CAMACHO and A. VERA agreed to meet at the same place.

b.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that A. VERA is again ordering cocaine base from CAMACHO.  I believe that A. VERA is trying to obtain one ounce of crack cocaine from CAMACHO for $800 and that CAMACHO is giving him a good deal because he is a regular customer of CAMACHO's.

57.  On September 23, 2008, SAGTF intercepted a call over Target Telephone #4 between CALDERON and A. VERA.  (Call # 579)

a.    CALDERON asked if A. VERA had any "rock."  A. VERA said yes and they agreed to talk later.

b.    Based on my training and experience, the investigation and the intercepted calls over the Target

66

Telephones, I believe that CALDERON is ordering cocaine base from A. VERA. I know that the term "rock" refers to rock cocaine or cocaine base.

58. On September 23, 2008, SAGTF intercepted a call over Target Telephone #4 between CALDERON and A. VERA. (Call # 589)

a. CALDERON asked A. VERA for a "whole one".

b. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe CALDERON is again asking A. VERA for cocaine base. Specifically, by her statement that she wants "a whole one," I believe she is looking to buy one ounce of crack cocaine from A. VERA.

59. On September 23, 2008, SAGTF intercepted a call over Target Telephone #4 between CALDERON and A. VERA. (Call # 594)

a. A. VERA told CALDERON that a third party had some and that the third party would sell it to CALDERON for "8." CALDERON told A. VERA that she would be sending someone to pick it up and A. VERA directed CALDERON to go down Flower Street to Washington Street turn right and it's the apartments on the left.

b. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that A. VERA was directing CALDERON to go to CAMACHO's apartment to pick up the cocaine base. I believe that A. VERA contacted CAMACHO earlier in the day to obtain

cocaine base and that he is selling that cocaine base to CALDERON. A. VERA's description of the location where CALDERON can pick up the cocaine base is the apartment complex where CAMACHO resides. I believe that CALDERON was going to obtain the one ounce of cocaine base from CAMACHO, through A. VERA, for the price of $800.

60. On September 23, 2008, SAGTF intercepted a call over Target Telephone #4 between CALDERON and A. VERA. (Call # 596)

a. A. VERA during the call gave CALDERON the phone number of 605-8649 so CALDERON could call and arrange to pick up "it" up.

b. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I know that the phone number A. VERA provided CALDERON is the telephone number of CAMACHO. I believe that A. VERA provided this number so CALDERON could arrange to purchase the cocaine base from CAMACHO.

61. I further know that the individual identified as CALDERON in the above telephone calls is CALDERON because she provided cellular telephone (714) 661-3241 to the Santa Ana police department on August 21, 2008 when she reported a stolen vehicle. This is the telephone number she was using to contact A. VERA. She also provided an address of 1702 Evergreen Street, Apt. C, Santa Ana, California, with CDL D2138547. A review of CA

68

DMV records for CDL D2138547 reveal that it is for CALDERON with a date of birth October 21, 1982. A review of cellular records for Sprint telephone (714) 661-3241 lists the subscriber as Gloria Carlton, 1702 Evergreen Street, Santa Ana, California, date of birth October 21, 1982. Based on my training and experience, I know that people involved in narcotics trafficking often attempt to conceal their true identities when obtaining a telephone subscription.

62. On September 24, 2008, SAGTF intercepted a call over Target Telephone #4 between CAMACHO and A. VERA. (Call # 672)

a. A. VERA asked CAMACHO for some "jale." CAMACHO said he had some and A. VERA asked CAMACHO to wait because A. VERA was waiting on his runner.

b. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I know that the term "jale" is Spanish term for work and a slang term for possessing narcotics. Based on the earlier calls, I believe that A. VERA is contacting CAMACHO looking to purchase one ounce of crack cocaine.

## AA. GOICOCHEA Sells CI #2 Methamphetamine

63. On September 24, 2008, CI #2 conducted a controlled narcotics purchase from GOICOCHEA at the direction of the SAGTF.

a. CI #2 called TFO Franks and told him that GOICOCHEA was currently in possession of a half ounce of

methamphetamine.  CI #2 told TFO Franks that GOICOCHEA was selling the half ounce for $825.

b.   TFO Franks instructed CI #2 to purchase the methamphetamine.  CI #2 was issued $830 in U.S. Government funds and a digital video recorder.

c.   CI #2 drove to GOICOCHEA's former residence in Bishop Manor (1000 E. Bishop #U4, Santa Ana, California).  CI #2 arrived and knocked at GOICOCHEA's door.  GOICOCHEA answered the door and invited CI #2 inside.

d.   GOICOCHEA placed methamphetamine on a scale and weighed out 14 grams.  GOICOCHEA placed the substance in a plastic baggie and gave it to CI #2.  CI #2 gave GOICOCHEA $825.

e.   CI #2 was searched prior to and after the transaction and CI #2 turned over to SAGTF immediately afterwards the approximate 14 grams of methamphetamine he received from GOICOCHEA.  It presumptively tested positive for methamphetamine.

BB.   **A. VERA and DUARTE Conspire to Distribute Heroin**

64.  On September 27, 2008, SAGTF intercepted a call over Target Telephone #2 between A. VERA and DUARTE.  (Call # 837)

a.   DUARTE asked A. VERA if he had any "black."

b.   Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I know that "black" is a reference to heroin.  I believe that DUARTE was calling A. VERA to see if he could obtain

70

heroin.

## CC.    CHEBOTAREV Obtains Additional Heroin From A. VERA

65.    On September 30, 2008, SAGTF intercepted two calls over Target Telephone #4 between CHEBOTAREV and A. VERA.    (Call # 1080)

a.    CHEBOTAREV called A. VERA and asked if A. VERA was around and said he would be there in 10 minutes.

b.    In the next call, CHEBOTAREV told A. VERA "I'm turning."  A. VERA tells CHEBOTAREV to park in the parking lot.

c.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that CHEBOTAREV is again purchasing heroin from A. VERA.  A. VERA directed CHEBOTAREV to park in a lot off Camile Street where they can conduct the transaction.

d.    SAGTF conducted surveillance during this time and observed a black Audi CA license 6BWZ942, depart Camile Street and drive away north on Standard Street shortly after the intercepted calls.  The registered owner of the vehicle is Filipp CHEBOTAREV, 22852 Via Octavo, Mission Viejo, California.

e.    I believe that, based on the intercepted calls and surveillance, CHEBOTAREV picked up heroin from A. VERA.

## DD.    STEWART Obtains Additional Narcotics To Distribute From A. VERA

66.    On September 24, 2008, SAGTF intercepted three calls over Target Telephone #4 between STEWART and A. VERA.    (Call #

71

645/648/649)

    a.   STEWART called and asked for $100 of "black." A. VERA said he could give her a "7." STEWART then asked for a "10" and said that she had to get through two days and didn't want to call A. VERA on her daughter's birthday. A. VERA agreed to give her a "10." A. VERA directed STEWART to drive to Santa Ana.

    b.   At approximately 9:17 a.m., A. VERA received an incoming call from STEWART. STEWART advised that she did not want to drive over to Camile Street because she saw too many police cars and she had her daughter with her.

    c.   At approximately 9:24 a.m., A. VERA received an incoming call from STEWART. A. VERA directed STEWART to Standard Street and First Street at the auto parts store.

    d.   SAGTF initiated surveillance on Camile Street as a result of these incoming calls. At approximately 9:20 a.m., a black Nissan Altima was observed parked on the street in front of 929 E. Camile. At approximately 9:36 a.m., the Nissan Altima, driven by A. VERA, was observed by members of the SAGTF driving north on Standard to meet with STEWART. The SAGTF team observed A. VERA meet with STEWART at the southwest corner of Standard and First in the parking lot of a auto parts store. TFO Ochoa observed the meeting between A. VERA and STEWART and confirmed the driver of the Altima was A. VERA. A. VERA was then observed driving back to and parking in front of 929 E. Camile (**SUBJECT**

72

**PREMISES ONE**) at approximately 9:41 a.m.  A. VERA was last observed walking south on Camile Street.

e.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe Stewart ordered heroin from A. VERA and that STEWART was going to meet with A. VERA to pick up the heroin.  I believe that A. VERA agreed to sell STEWART approximately 10 grams of heroin for $100.

67.  On September 29, 2008, SAGTF intercepted three telephone calls over Target Telephone #4 between STEWART and A. VERA.

a.    In the first call, STEWART told A. VERA that her friend Carol wanted to pick up drugs from A. VERA.  STEWART said that she herself could not go to A. VERA until the next day, which is why she was asking if it was okay with A. VERA to send Carol on her own to pick up.  STEWART told A. VERA that if Carol did go, she would send her in STEWART's van.  She then told A. VERA that Carol didn't want to do it, but that she told Carol to take STEWART's van and it would be okay.

b.    About 20 minutes later, STEWART called A. VERA again.  STEWART said that Carol didn't want to go to Warren Street in Santa Ana because she was afraid so she asked A. VERA if he could meet her at Jack-in-the-Box.  A. VERA said it was okay and asked what did she, referring to Carol, need.  STEWART

73

said that Carol would have $70 with her. STEWART then said to giver her "3 black and one 20." STEWART then asked A. VERA to hold on. STEWART was overheard talking to a third person saying "3 pieces of black and he [UI] over at uh... around Edinger...".

c. About 15 minutes later, STEWART called A. VERA gain. STEWART told VERA that Carol wouldn't do it. STEWART explained that she is at the bank cashing her daughter's birthday check, so she could pay VERA. STEWART said she would call when she was at the Jack-in-the-Box.

d. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that these calls are related to STEWART brokering a drug transaction for a third person, Carol. STEWART uses the slang term "black" to describe heroin. I believe in this call she was asking for $70 worth of narcotics, which is likely about three grams of heroin for $50. The 20 that she asked about in the call, I believe, is most likely a reference to .25 grams of cocaine, one dosage unit for approximately $20. I believe this is likely a personal use amount, probably for herself. I know that cocaine sells at about $80 per gram.

68. On October 1, 2008, SAGTF intercepted a call over Target Telephone #4 between STEWART and A. VERA.

a. STEWART was heard talking to a third person in the background. She asked the third person "How much do you have?"

STEWART then told A. VERA that her friend has 100 and that she wanted to give him 30. STEWART then asked what A. VERA was bringing for 70. She further told A. VERA that he used to give her "five of those little things...and then a little thing of white." She then talked about owing him money for past buys. STEWART told A. VERA that it was not her money, that she, a third person, "just going to give me a little bit."

b. STEWART then told A. VERA "I'm just stealing all of my uncle's customers, picking up for 'em up there from you and they just give me a little issue just to stay well, you know what I mean?" A. VERA then told her that he could give her "four little bags and a little bit of coke." STEWART told VERA that she only wanted "one little thing of coke." She added, "I care more about the black." They then agreed to meet.

c. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that STEWART is again buying narcotics for another individual. In the call, STEWART stated that the money was not hers, but that the third person was going to give her a little bit. It is my opinion that STEWART is brokering the deal for this third person, who is paying STEWART by giving her some drugs. In this case, STEWART was setting up a deal for four grams of heroin, and she would receive the cocaine, "the little thing of coke," as her fee for setting up the drug deal for the

75

third person.

d.   In the call, STEWART also refers to her distributing narcotics to other people.  She stated that she had stolen her uncle's customers.  I believe that this is a reference to the same uncle that had given her the "clavo" (ounce of heroin) referred to in an early call.  I believe that STEWART is now picking up drugs for them.  In turn, I believe that they give her a "little issue," which is a reference to some drugs, so she can stay well, referring to not having to go through withdrawals. I believe that STEWART herself is a narcotics user, but that she has also been picking up extra drugs from A. VERA and VERA to distribute to other individuals.

## EE.   Calls Evidencing Higher-Ranking Gangs Want to Tax VERA for His Drug Trafficking Activities

69.   During the period of interception over the Target Telephones, SAGTF also intercepted several calls on Target Telephone #1, VERA's telephone, demonstrating that VERA was getting pressure to pay money to larger and more high-ranking gangs because he was running a narcotics distribution organization within their territory.

70.   On August 8, 2008, SAGTF intercepted a call over Target Telephone #1 between VERA and RICHIE LNU. (Call # 39)

a.   VERA asked RICHIE LNU what happened.  RICHIE LNU told VERA that "Roach" had come by to collect money from him. RICHIE LNU believed that "Roach" ratted him out to the "big

76

homie," - "Big Oso" from F-Troop.   RICHIE said he met with Big

Oso after Roach had ratted him out.   Big Oso wanted RICHIE to pay

$1000.00 for all of the work he had done before he went "inside."

Big Oso said he could make payments or pay it all up front.

RICHIE LNU did not want any problems, so he payed it in full.

VERA asked RICHIE LNU if Big Oso was looking for VERA.   Big Oso

told RICHIE LNU that VERA's name was on the list, and that for

now on when someone gets busted, they will hit him up for that if

they haven't paid.   RICHIE LNU said "they are going to charge

taxes."   VERA told RICHIE LNU that a guy named "Tigre" came on

Big Oso's behalf looking for VERA.   VERA said that the guy told

Tigre that VERA was not around.

       b.    RICHIE LNU told VERA that someone was going around

saying that he, RICHIE LNU, spilled the beans on everyone in

Santa Ana.   RICHIE LNU told VERA that if someone came looking for

VERA that it was because Roach had ratted him out and that thing

on "Bristol or something."

       c.    RICHIE LNU and VERA talked about how "they"

couldn't do anything unless they are from a neighborhood.   VERA

told RICHIE LNU that it was serious only when you are from a

"hood."   VERA said that the minute you go into jail you have to

give your nickname and where you are from.   VERA asked if they

said anything about the guy from Delhi.   RICHIE LNU said they did

not, he only spoke to Big Oso from F-Troop.

77

d.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that this telephone call is a discussion involving extortion.  In the call, RICHIE LNU explained to VERA that he was approached by Roach on behalf of Big Oso from F-Troop to pay $1000 before RICHIE LNU starts his jail term.  I know that members of the Mexican Mafia or their associates will charge drug dealers a "tax" for the right to sell drugs in certain neighborhoods, and for protection when they go to jail.  I have learned that Big Oso from F-Troop, a Santa Ana street gang, is a Mexican Mafia associate.

e.    VERA also inquired in the call about a guy from Delhi.  Based on the investigation, my training and experience, and my conversations from other knowledgeable gang detectives in Santa Ana, I know that MIKE SALINAS is a member of the Mexican Mafia who is also a Delhi gang member.  I believe that this is the Delhi gang member that VERA is referring to.  Based on the fact that gang members affiliated with the Mexican Mafia are looking for VERA for the purpose of taxing him, I believe that he is running a large-scale narcotics distribution network.  I believe that the fact that a larger gang wants to extort VERA shows that VERA is distributing narcotics through his gang, the Minnie Street Lopers.

71.    On September 14, 2008, SAGTF intercepted call between

78

VERA and WALTER LNU.  (Call #1965)

a.    WALTER LNU told VERA that the guys, Chito and Lefty, from Eastside came to his house to "collect rent," because they believed that WALTER LNU was providing drugs to VERA. WALTER LNU told them he did not "sling," that he works for a living.  WALTER LNU said that they assumed he was selling drugs, because he drives a BMW.  They also believed he was paying rent to a guy from Delhi.  VERA said those guys are nobodies.  WALTER LNU said they were coming from "higher sources."  WALTER LNU told VERA "they're gonna let you have it, man.  No mercy."  WALTER LNU added there are a "couple of heads out" and they are upset.

b.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe this telephone call is also a discussion about extortion from other gang members.  I have learned through my training and experience that the term "collect rent" means to collect extortion payments from drug dealers to allow them to deal drugs in a certain neighborhood.  In this call, WALTER LNU was warning VERA that other gang members from more high-ranking gangs were aware of VERA selling drugs.  WALTER LNU was warning VERA they would be looking for VERA to collect money because of his narcotics trafficking.

///

///

79

## X.   ADDITIONAL PROBABLE CAUSE FOR THE CONSPIRACY

### 72.   ALEJANDRO BARRAGAN

a.   On July 12, 2008, SAGTF intercepted a call between BARRAGAN and A. VERA over Target Telephone #2.

i.   BARRAGAN asked A. VERA if he could "front" him 40 of soda.  A. VERA said that BARRAGAN owed 20 from a previous deal.  BARRAGAN agreed to pay A. VERA 60 and they agreed to meet.

ii.   Approximately two hours later, BARRAGAN called A. VERA again and said that he needed another 40 and he would pay for it.  A. VERA agreed.

iii. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that in this call BARRAGAN uses the slang term "soda" which I believe to be a reference to cocaine.  I believe that BARRAGAN is asking A. VERA for "40" which is a cryptic description of $40 worth, or a half of a gram, of cocaine.  In the second call, I believe that BARRAGAN is also asking for another half gram of cocaine.  I further know that the term "front" means to provide drugs before paying for them.  I believe that this call shows that BARRAGAN and A. VERA are close narcotics associates because the call shows that BARRAGAN has been fronted narcotics previously and is asking to have narcotics fronted to him again.  I know that only narcotics dealers with an

80

established relationship front narcotics in order to ensure they get paid. Here, I believe that this call shows that BARRAGAN routinely obtains narcotics from A. VERA for further distribution in the Bishop Manor area.

73. <u>JESUS HIGAREDA</u>

a. On July 16, 2008, SAGTF intercepted a call between J. HIGAREDA, aka "Yogi," and JUVENILE over Target Telephone #3.

i. HIGAREDA wanted to know the price of an "8." JUVENILE said that "Mando" (A. VERA) does not sell 8s because he does not make much profit off of them. HIGAREDA said that an "8" is what they asked for and he does not know the prices. HIGAREDA then said that he would ask the guy if he wanted a half or a 7.

ii. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that in this call that HIGAREDA is asking for a small quantity of narcotics. I know that an "8" is a slang term referencing an "8 ball" which is a unit of measurement - 3.5 grams or 1/8th of an ounce. JUVENILE told HIGAREDA in the call that A. VERA does not sell that small of a quantity because there is no profit in it. HIGAREDA then told JUVENILE that he would see if the guy wanted a "half" or "7." Again, I know that these are slang terms for unit of measurements for drugs. I believe that "half" refers to half an ounce and "7" refers to a quarter ounce, approximately 7 grams. I further believe that this call

81

demonstrates HIGAREDA distributing on behalf of VERA and A. VERA. I believe that HIGAREDA is attempting to obtain narcotics from A. VERA to further distribute in the Bishop Manor area.

74.    LETICIA SANCHEZ

a.    On January 25, 2008, at approximately 4:00 p.m., SAPD received a telephone call from an individual who resided in the Bishop Manor Complex and who was involved in the homeowners association.  This individual contacted the SAPD after being intimidated by residents of the Bishop Manor Complex (hereinafter "CS").[1]

b.    The CS stated that on January 21, 2008, at approximately 5:00 p.m., the CS was inspecting the lights in the carport area of the Bishop Manor Complex.

i.    The CS stated that the lights had been out and the CS had recently had them repaired.  While the CS was standing next to a white SUV, the CS was approached by two females.  The females accused the CS of writing down the license plate of their brother's car and demanded to know what the CS was doing.  The CS began explaining what the CS was doing when the CS

[1]The CS provided his/her name to the SAPD officer who took the call and drafted a report, but due to threats made against the CS, his/her name is being left out of this affidavit.  The CS has not been contacted by SAGTF due to concerns for the CS's safety given the threats that the CS has received.  The information regarding VERA and his sisters has been corroborated by information received from CI #1.  The information provided by the CS has also been corroborated by CS #2 who purchased narcotics from SANCHEZ on April 22-23, 2008 as detailed herein.

82

was approached by a Hispanic male that the CS recognized as Salvador VERA. The CS knew VERA to be the main drug dealer in the Bishop Manor Complex.

ii. The CS explained to VERA that the CS was inspecting the lights, not writing down license plates. VERA told the CS that people in the complex have told him that the CS is a "rat" and that the CS works with the police. VERA also stated that he has friends in the police department and they told VERA that the CS was working with the police. VERA told the CS to watch himself/herself and not to cause any problems. The CS explained to the SAPD officer that the CS believed this to be a threat because the CS knew VERA to be a drug dealer and the CS was afraid of him.

b. On January 25, 2008 at approximately 4:00 p.m., a family member of the CS was approached by SANCHEZ who resided in apartment H1 of the Bishop Manor complex.

i. The CS stated that SANCHEZ told the CS's family member that the CS better stay away from the Bishop Manor Complex because Sanchez was going to get the CS. SANCHEZ said that something would happen to the CS's family members unless the CS stopped causing problems in the complex.

ii. The CS also took this incident as a threat because the CS stated that the CS knew that SANCHEZ deals narcotics from her apartment in the Bishop Manor complex.

c.    The CS further stated to the SAPD officer that the CS contacted SAPD so that they would have the information and be aware of the situation in the complex.

d.    On May 20, 2008, SAGTF intercepted a call between SANCHEZ and VERA over Target Telephone #1.

i.    SANCHEZ said that a guy just called her cell phone saying that he was "Chiquis's" friend (Roberto Higareda, aka Chiquis), the guy with the black truck.  SANCHEZ asked VERA if he remembered who this guy was.  VERA said he didn't really know him, but had seen him.  SANCHEZ said that the guy said he and Chiquis had purchased a quarter pound of "crystal" from VERA.  VERA said that nobody had bought anything from him.  SANCHEZ said that the guy insisted he bought it from VERA.  SANCHEZ said the guy wanted VERA'S telephone number.

ii.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that in this call SANCHEZ is asking VERA if he remembered selling a quarter pound of methamphetamine to an individual that had contacted SANCHEZ.  This individual was supposedly a friend of Chiquis, Roberto Higareda, who is also engaged in distributing narcotics within Bishop Manor.  I know from my experience as a detective, that the term "crystal" is slang for methamphetamine.  I further believe that this call demonstrates the relationship between SANCHEZ and VERA.  I

84

believe that they have agreed to conspire to distribute narcotics in the Bishop Manor area and that SANCHEZ often deals with the same customers that VERA deals with.

75. <u>RUBEN GUERRERO OREJEL AND THE MONDRAGONS</u>

a. Based on the investigation in this case, my training and experience, and the communications intercepted over the wiretaps, I know that OREJEL is a protected narcotics dealer in the Bishop Manor area. He is a close friend and associate of VERA. In fact, OREJEL, GOICOCHEA and VERA grew up together in the Santa Ana area. They all now are narcotics traffickers in the Bishop Manor area and they all distribute narcotics within the area with the knowledge and agreement of each other. I also know that OREJEL is a close narcotics associate of A. VERA and often supplies heroin to A. VERA. I believe that MONDRAGON and S. MONDRAGON work for OREJEL in distributing narcotics. Specifically, S. MONDRAGON assists in actually distributing the narcotics that OREJEL has agreed to supply or distribute. MONDRAGON acts as a communication source and delivery person for OREJEL and OREJEL's customers, as well as serves as a conduit between OREJEL and VERA and/or A. VERA.

b. On Sept. 20, 2008, SAGTF intercepted a call between OREJEL and A. VERA over Target Telephone #4.

i. During the call, OREJEL asked A. VERA if he needed any "pantaloncillos" because OREJEL was going out to run

85

an errand and he wouldn't be back until late. A. VERA said he was not sure. OREJEL then told A. VERA that "Little Clown" is going to be there around 5:00 or 6:00 p.m. OREJEL told A. VERA that if he needed anything to just ask "Little Clown".

ii. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that in this call OREJEL is asking A. VERA if he needed any heroin because OREJEL would be gone for a while. I know that "pantaloncillos" means "little pants" in Spanish. I further know that "pants" are a codeword used by narcotics dealers to describe heroin. I believe that OREJEL supplies heroin to A. VERA and OREJEL is checking in with A. VERA to see if he needed any heroin at that time.

iii. I also believe that this call shows that A. VERA also obtains heroin from "Little Clown" who I know is MONDRAGON. I believe that MONDRAGON assists OREJEL in supplying A. VERA with heroin. A. VERA responded to OREJEL's question of whether he needed more heroin by stating that he was not sure. OREJEL then told A. VERA to ask "Little Clown" if A. VERA decided he needed heroin. I believe that OREJEL told A. VERA to contact MONDRAGON because MONDRAGON is OREJEL'S drug runner who assists OREJEL in distributing narcotics.

c. On Oct. 8, 2008, SAGTF intercepted a call between A. VERA and OREJEL over Target Telephone #4.

i.    A. VERA asked if he could "send for two"? OREJEL affirmed and told A. VERA that was at home.  A. VERA asked OREJEL if he could send the money later.  OREJEL affirmed and said it was not a problem.

ii.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that in this call A. VERA is purchasing two ounces of heroin from OREJEL.  I know from the investigation that OREJEL is a heroin supplier and distributor.  For example, on September 23, 2008, CI #2 made a controlled purchase of five ounces of heroin from OREJEL which was brokered by MONDRAGON.  In this call, I believe that A. VERA is using cryptic language to set up the drug deal.  I have learned that cryptic language to describe just an amount between long time drug dealing associates is commonplace.  It is my opinion that since OREJEL deals in larger quantities of heroin and A. VERA sells heroin, that A. VERA is asking OREJEL for two ounces of heroin.  It is also my opinion that since they are long time associates, OREJEL trusts that A. VERA will pay him back for the drugs at a later date so OREJEL is essentially "fronting" the narcotics to A. VERA.

## XI.    ADDITIONAL PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

76.    **SUBJECT PREMISES ONE.**

a.    This is believed to be a residence used by VERA and A. VERA.  I believe that VERA and A. VERA currently reside in

**SUBJECT PREMISES TWO**, but that they use **SUBJECT PREMISES ONE** to store their narcotics and narcotics proceeds.  Essentially, I believe they use this residence as a "stash pad."

b.    Germin Yera and Maria Vera currently reside in **SUBJECT PREMISES ONE**.  G. Yera is the brother-in-law of VERA and Maria Vera is VERA's sister.  In addition, JUVENILE, the juvenile relation to VERA, is also believed to reside at **SUBJECT PREMISES ONE**.

c.    On May 14, 2008, a SAPD report #08-17822 lists the home address of Germin and Maria Yera and JUVENILE as 929 E. Camile, Santa Ana, California.  The report was filed because JUVENILE had been stopped by uniform patrol officers on that date regarding a curfew violation.  JUVENILE was released to the custody of his aunt, Maria Vera, after being cited for being a minor out past curfew.  Based on this report, I believe that Maria and Germin Yera and JUVENILE reside at **SUBJECT PREMISES ONE**.

d.    I also believe that VERA and A. VERA stash narcotics in the yard area, specifically in the trunk of a tree on the property.

e.    On May 29, 2008, SAGTF intercepted call between A. VERA and VERA over Target Telephone #1.  (call 1670)

i.    A. VERA discussed conducting a narcotic transaction with VERA.  A. VERA told VERA to give a UM "three of

the type they give Sarah and a $20 one that [JUVENILE] knows where the $20 one is." Later in the call, A. VERA said "[JUVENILE] knows where they are." Still later in the conversation, A. VERA said he (reference to JUVENILE) also knows where those 20 ones are and that they are in the "tronco" (Spanish term for tree trunk or log).

ii. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that A. VERA is directing VERA to where the drugs are hidden. A. VERA is cryptically referring to an amount of a narcotics by such phrases as "three" or a "20". Furthermore, I believe that VERA and A. VERA direct JUVENILE where to hide narcotics or where the narcotics are hidden in a tree at his house, SUBJECT PREMISES ONE. I believe that VERA and A. VERA hide the narcotics there to avoid law enforcement detection.

f. On July 10, 2008, SAGTF intercepted a call between VERA and A. VERA, over Target Telephone #2. (Call # 17)

i. VERA called A. VERA to tell him that Chiquis (Roberto Higareda) just got arrested. VERA stated that [JUVENILE] needed to "clean the house."

ii. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that VERA wanted JUVENILE to get rid of any

narcotics that were around in order to avoid law enforcement detection. I believe that VERA feared that HIGAREDA might be connected to VERA or A. VERA or R. VERA and VERA wanted any narcotics to be removed to avoid detection. I know that on or about July 10, 2008, Roberto Higareda was arrested by the Santa Ana Police Department for possession/sales of narcotics within the City of Santa Ana.

g. On July 11, 2008, SAGTF intercepted calls between VERA and JUVENILE and A. VERA and JUVENILE.

i. In the first intercepted call, VERA told JUVENILE to go and get everything Mando (A. VERA) has in the hole because the firemen were digging up the holes and says to take everything out and put it somewhere else. VERA then asked if there were police officers there and JUVENILE said no but there were a lot of firemen. VERA then instructed JUVENILE to "Just stick your hand in there and take it."

ii. Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe VERA was instructing JUVENILE to remove narcotics that were hidden in holes at **SUBJECT PREMISES ONE** in case the fireman discovered them.

iii. This call is also in reference to the SAFD (Incident Report #08-09682) in which the fire department responded to a call in Bishop Manor, 1001 E. Camile, Santa Ana,

California.  This address is in close proximity to **SUBJECT PREMISES ONE**.  At approximately 1:47 p.m., SAFD responded to an incident initially called in as a "Combustible/flammable gas/liquid condition."  When SAFD arrived at the location, they found a green substance coming from the sewer which was later determined to be anti-freeze.  The SAFD departed from the Bishop Manor at approximately 3:38pm.

        iv.   JUVENILE called A. VERA.  VERA then came on the phone and asked A. VERA if he has a lot of stuff in the {UI}.  A. VERA said that he didn't think there was any.  VERA asked A. VERA if he removed it.  A. VERA said no, they ran out of it.  A. VERA asked VERA if they need some.  VERA asked A. VERA if he stashed anything in the hole where he always stashes things away because they're checking right now.  A. VERA then asked VERA who is checking.  VERA said the fireman are by where German lives because he (VERA) thinks a pipe broke.  A. VERA said there is nothing there because he removed everything yesterday.

        v.    Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe VERA and A. VERA are talking about illegal drugs hidden in holes at **SUBJECT PREMISES ONE**.

        h.   On October 2, 2008, SAGTF intercepted a call between a UM and A. VERA.  (Call # 1225)

        i.   UM called A. Vera and ordered a "30 of

91

powder."   A. VERA said he had two "20's" where he lives.   He told the UM  they are by "Mighty."   A. VERA then described the location of where the narcotics are hidden by saying "If you come to the front of my house, follow the wall, where the wood starts, on the bottom, next to the cement, they are there."

ii.   Based on my training and experience, the investigation and the intercepted calls over the Target Telephones, I believe that the UM is asking for $30 dollars of cocaine and A. VERA told the UM that he has two "20's," a cryptic term for an amount of illegal drugs.   A. VERA then described that the illegal drugs were stashed near A. VERA's dog "Mighty."

iii. Based on an intercepted call received on September 21, 2008, in which a UM told A. VERA that "Mighty" got out, I believe that "Mighty" is the name of A. VERA's dog.

iv.   On October 7, 2008, I spoke to Officer Jason Garcia, SAPD, who is assigned to the south east directed patrol team for the SAPD.   Officer Garcia advised that there is a dog house on the west side of **SUBJECT PREMISES ONE** between the residence and a brick wall.   Furthermore, Officer Garcia has observed a dog residing on the west side of the residence.   In addition, Officer Garcia reviewed aerial photographs taken of SUBJECT PREMISES ONE and pointed to the general location of the dog house (the west side of the residence on a cement walkway).   Officer Garcia also recalls seeing 2x4 pieces of wood near the

dog house. Based on A. VERA's description of the location where he stashes drugs, I believe that A. VERA is describing a location at **SUBJECT PREMISES ONE**.

i. October 6, 2008, around 10:45 p.m., TFO Franks saw A. VERA in the front yard at **SUBJECT PREMISES ONE** on the cell phone. At this same time, SAGTF intercepted a call over Target Telephone #4 in which A. VERA was warning someone that the cops were walking into Bishop Manor. TFO Franks was in SAPD uniform when he observed A. VERA.

j. I believe, based on this investigation, surveillance of VERA, A. VERA and their associates at this address, and intercepted conversations over the Target Telephones, that VERA and A. VERA are still using this residence to store narcotics or other evidence of his narcotics trafficking activities. I know that narcotics traffickers usually maintain narcotics, records and other indicia of their narcotics activities at their residences and stash pads.

77. **SUBJECT PREMISES TWO.**

a. This is believed to be the residence of VERA and A. VERA.

b. On August 13, 2008, the Tustin Police Department ("TPD") conducted a traffic stop of a vehicle driven by VERA, and that contained as passengers A. VERA, Germin Yera, and Marco Vera.

93

i.    During the traffic stop, TPD discovered that VERA was on California Department of Corrections(CDC) parole with gang terms.

ii.    On August 18, 2008, the TPD observed the same vehicle driven by VERA on August 13, 2008, in the driveway at **SUBJECT PREMISES ONE**.  When the TPD attempted to contact VERA at **SUBJECT PREMISES ONE**, A. VERA, who was in the driveway, took off running.  The TPD eventually detained A. VERA and asked if he lived at **SUBJECT PREMISES ONE**.  A. VERA stated he did not but instead was residing at **SUBJECT PREMISES TWO**.

iii. The TPD then questioned Germin Yera who advised that VERA lived at **SUBJECT PREMISES TWO**.  Germin Yera then advised that he (Yera) pays for the house at **SUBJECT PREMISES ONE** and lives there with his wife (Maria) and children. Yera then stated that he allows VERA to park his car at **SUBJECT PREMISES ONE** and that VERA "often visits."

iv.    When the TPD went to **SUBJECT PREMISES TWO** to conduct a parole search of VERA's upstairs bedroom, the TPD located approximately $2,000 in small denominations inside a shoe located in the bedroom belonging to VERA.  When the TPD questioned A. VERA about the money, A. VERA stated that he knew the correct amount ($2,000) and location of the money.

c.    On September 20, 2008, A. VERA was contacted by SAPD Officer Kirkpatrick regarding a traffic hazard involving a

94

vehicle registered to father of VERA. Officer Kirkpatrick filled out a field identification (FI) cards for A. VERA. A. VERA listed a home number of (714) 547-0725. A. VERA also gave an address of 1000 E. Bishop Street, Apt. A1, Santa Ana, California. I believe that A. VERA gave the officer a incorrect address to avoid law enforcement having knowledge of his true address. However, A. VERA did give the officer the true phone number for **SUBJECT PREMISES TWO.**

d.   On September 24, 2008, SAGTF officers intercepted a call placed by VERA, using Target Telephone #1, to A. VERA at (714) 547-0725, the home phone for **SUBJECT PREMISES TWO.** A. VERA answered the telephone and VERA told A. VERA to go upstairs to get the keys to his truck. Based on the fact that VERA referenced his belongings being at **SUBJECT PREMISES TWO**, his keys, and that A. VERA answered the home phone for **SUBJECT PREMISES TWO**, I believe that both A. VERA and VERA currently reside at **SUBJECT PREMISES TWO.**

e.   On September 25, 2008, SAGTF officers reviewed records of telephone number (714) 547-0725 which indicate that this is a residential phone assigned to Salvador Vera, 1001 E. Camile, Apt A1, Santa Ana, California (**SUBJECT PREMISES TWO**). Furthermore, the SAPD did a utility check and confirmed that this phone number is associated with the captioned address. The utilities at the captioned address come back to Salvador and

95

brother wanted to mail them all out. GOICOCHEA then asked CI #2 to give him a ride to his new home. During the call, GOICOCHEA said he had to moved to a new place, because his wife was pregnant and they needed their own place.

ii. CI #2 picked up GOICOCHEA and drove GOICOCHEA to his new address, 1101 S. Minnie St., Santa Ana, California. CI #2 then observed GOICOCHEA walk into Apartment 1.

## XII. CONCLUSION

80. Based on my knowledge of this investigation, I believe that VERA, A. VERA, and others known and unknown as outlined in this affidavit, have been active participants in a major drug distribution network operating in the Bishop Manor area for a substantial period of time. Furthermore, based on the facts set forth throughout this affidavit, I believe that the fruits, evidence, and instrumentalities of crimes committed against the United States by the Targets are presently concealed at the above listed locations and in the above described vehicles.

///

///

///

81.   Based upon the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a) and 846 have occurred by the Targets listed herein.

STEVEN LODGE
Santa Ana Gang Task Force Officer
Santa Ana Police Department

Sworn to and subscribed before me this ___19th___ day of October, 2008

ROBERT N. BLOCK
United States Magistrate Judge

ATTACHMENT A-1

**SUBJECT PREMISES ONE** is further described as:

929 E. Camile, Santa Ana, California, is a single story family residence located at the end of a cul-de-sac next to a brick wall on the north side of E. Camile Street.  The tan stucco residence has a tan shingle roof, tan wood trim, and a red brick pillar on the porch.  The front door (black security door) faces south towards Camile Street with the numbers "929" located on the curb directly in front of the residence.  In the backyard is a detached garage that is located on the north east portion of the property.

There are two trees, one on the sidewalk frontage area and one located in the front yard.  There is a black wrought iron fence combined with tan stucco and red brick pillar located in the front yard.  There is a "Beware of Dog" sign located on the entry gate of the black wrought iron fence.

ATTACHMENT A-2

**SUBJECT PREMISES TWO** is further described as:

1001 E. Camile, Unit A1, Santa Ana, California, is part of the complex known as the Bishop Manor apartments and is located at the end of a cul-de-sac on Camile Street.  To the north and east are commercial buildings.  Bishop Manor is a multi-unit complex comprised of 9 separate buildings, each containing 4 apartments.  Unit A is a two story building located on the far northwest portion of the complex next to the cul-de-sac on E.Camile Street.  Unit A1 is a end unit (south) with an east facing front door.  "A1" in written in 4 inch black letters above the door.

ATTACHMENT A-3

**SUBJECT PREMISES THREE** is further described as:

1000 E. Bishop, U2, Santa Ana, California, is a multi-unit residential complex comprised of several two story stand-alone buildings, each comprised of 4 units. The west entrance to the complex is located at the end of a cul-de-sac on E. Bishop. To the east of 1000 E. Bishop are railroad tracks that run north and south. To the north and south are multi-unit residential complexes. Building U is on the south portion of the complex with building W to the west and building R to the east. Unit U2 is a two-story unit with a west facing front door. Unit U2 is located between Units U1 and U3. The front door is comprised of a black security door. The address "U2" is located above the front door in black.

ATTACHMENT A-4

**SUBJECT PREMISES FOUR** is further described as:

1101 S. Minnie Street, Apt. 1, Santa Ana, California, is a multi-unit residential complex. 1101 S. Minnie is the seventh two-story structure north of McFadden Street. Minnie Street runs north and south. Each two-story structure contains 8 to 10 units. The structure has white stucco, a brown composite roof, peach wood trim, and the numbers "1101" in five inch black letters. Apartment 1 is a bottom unit on the southwest corner of the structure. The apartment is on the east side of Minnie Street. The front door faces east with a "1" in gold on the front door.

ATTACHMENT B

Items to be Seized from the Subject Premises:

    a.    Narcotic drugs and controlled substances, including cocaine, crack cocaine, methamphetamine, drug paraphernalia, pipes, cutting agents and solvents, measuring devices and weighing devices, scales, sieves, strainers, testing devices, plastic, tinfoil, cellophane, jars, plastic bags, containers, pill presses, paper bindles, glass vials, razor blades, mirrors, straws and other inhaling devices, rubber gloves, and other items used in the packaging of controlled substances.

    b.    Quantities of cash in excess of $1,000.

    c.    Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the price, quantity and/or times when narcotics were obtained, transferred, imported, sold, distributed, and/or concealed.

    d.    Bank account records, wire transfer records, bank statements, safe deposit box keys and records, income tax returns, financial records and notes showing payment, receipt, concealment, transfer, or movement of money, and financial instruments purchased with amounts of currency or $1,000 or more, including travelers checks, bonds, stock certificates, cashier's

checks, and certificates of deposit, all limited to the period of January 1, 2006 to the present.

e.   Telephone paging devices, beepers, mobile telephones, Blackberry devices, car telephones, and other communication devices.

f.   Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, personal notes, photographs, film, undeveloped film, videotapes, audiotapes, and other items reflecting names, addresses and telephone numbers, communications, and/or association with other individuals involved or believed to be involved in drug trafficking activities.

g.   Money wrappers, rubber bands, money containers, money counting machines, boxes, bags, briefcases, suitcases, or containers used to carry large amounts of currency or controlled substances.

h.   Records, documents, and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items, and the keys to any such real estate, vehicles, or safe deposit boxes, all limited to the period of January 1, 2006 to the present.

i.   Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, cancelled checks, maps, and

written directions to locations, all limited to the period of January 1, 2006 to the present.

j.   Indicia of occupancy, residency, or ownership of the premises and things described in this warrant including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, cancelled envelopes and keys, and bank account records, all limited to the period of January 1, 2006 to the present.

k.   Handguns, shotguns, and other firearms.

l.   As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form.  This includes any electronic device capable of data processing (such as central processing units, laptop or notebook computers, personal digital assistants, and wireless communication devices such as telephone paging devices, beepers, and mobile telephones); peripheral input/output devices (such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media); related communications devices (such as modems, cables, and connections); storage media, as defined below; and security devices, also as defined below.

m.   As used above, the terms records, documents, programs, applications or materials include records, documents,

programs, applications or materials created, modified or stored in any form.

n.    In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

i.    Upon securing the premises, law enforcement personnel trained in  searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices.

ii.   If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

iii. If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer personnel will

determine whether it is practical to copy the data contained on the computer devices during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve that data. If it is practical, and the computer devices cannot be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the computer personnel will make a copy of the data contained on each computer device (a "data image") during the execution of this search and shall seize the data images rather than the computer devices themselves.

iv. If the computer personnel determine it is not practical to perform an on-site search of the computer devices or make an on-site data image within a reasonable period of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

v. In searching the computer devices or data images, the computer personnel may examine all of the data contained in the computer devices or data images to view their precise contents and determine whether the data falls within the

items to be seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

vi.   If the computer personnel seize the computer devices pursuant to subparagraph iv above or make a data image pursuant to subparagraph iii above, the computer personnel will initially search the computer devices or data images within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant.  If, after conducting such an initial search, the case agents determine that a computer device or data image contains any data falling within the list of items to be seized pursuant to this warrant, the government will either (1) return the computer device, keeping a data image for further analysis, provided that, prior to such return, the owner and user(s) of the computer device stipulate individually and in writing to the authenticity and accuracy of the data image or (2) seek an order of the Court allowing the government to retain the original computer device for further analysis.  If a computer device or data image does not contain any data falling within the list of the items to be seized pursuant to this warrant, the government will return the computer device or delete the data

image.  If the government needs additional time to determine whether the computer device or data image contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty day period from the date of execution of the warrant.

o.    In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i.    Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

ii.   Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators,

electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv.   Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.